NBC SUBSIDIARY (KCNC–TV), INC.
and Suzanne McCarroll,
Petitioners,

v.

The LIVING WILL CENTER, a limited
liability company, and Merrill G.
Hastings, Jr., Respondents.

No. 93SC214.

Supreme Court of Colorado,
En Banc.

July 11, 1994.

Rehearing Denied Sept. 6, 1994.

Gibson, Dunn & Crutcher, George B. Curtis, Laura M. Hill, Denver, National Broadcasting Company, Inc., Anne H. Egerton,

Marjorie Nieset Neufeld, Burbank, CA, for petitioners.

Edward Dale Parrish, P.C., Dale Parrish, Denver, for respondents.

Davis, Graham & Stubbs, Andrew M. Low, Denver, for amicus curiae Colorado Broadcasters Ass'n.

Cooper & Kelley, P.C., Thomas B. Kelley, John R. Mann, Denver for amicus curiae Colorado Press Ass'n.

Baker & Hostetler, Kathryn A. Elzi, Denver, Bruce W. Sanford, Henry S. Hoberman, Robert D. Lystad, Washington, DC, for amicus curiae Society of Professional Journalists.

Chief Justice ROVIRA delivered the Opinion of the Court.

In *Living Will Center v. NBC Subsidiary (KCNC–TV), Inc.*, 857 P.2d 514 (Colo.App. 1993), the court of appeals held that a television station and one of its reporter's [1] broadcasts concerning a product marketed by the Living Will Center (LWC) implied material assertions of fact capable of verification and thus, the telecast was not constitutionally privileged speech in an action for defamation. We granted certiorari to determine: (1) whether that holding is in accord with the applicable precedent of the United States Supreme Court and this court; and (2) whether the court of appeals erred in failing to review the trial court's determination that the substance and gist of the broadcasts was true and if so, if that determination was correct.[2] We reverse and remand with directions.

I

LWC markets a packet of information, forms, and services intended to provide its customers with a comprehensive, up-to-date source for drafting and implementing a living will. The packet is sold for $29.95 and consists of a current Colorado living will form; a durable power of attorney for health care form; a medical directive form which gives directions to a treating physician regarding specific medical treatment for various medical conditions; a personal identification card which contains a reduced copy of the living will, the location of the owner's living will, the name and address of the person's doctor, and information regarding the holder of the durable power of attorney for use in the event of an emergency. As part of its services, LWC keeps a registry of its customers' names and addresses so they may be apprised of changes in law or medical technology affecting their living wills. Customers also receive a quarterly newsletter that contains information about changes in the law and other developments regarding living wills.

LWC brought this action as a result of two reports about its product which were televised on successive days on KCNC's 4:00 p.m. news broadcast.[3] The first broadcast was introduced as follows:

Living wills have become a popular and legal way of maintaining some control over your dying days. They allow you to make difficult life and death decisions. Do you want to be kept alive on life support systems? Artificially fed? Hospitals and libraries throughout the metro area offer living will forms free of charge. And now, a new Denver company is capitalizing on the living will trend, charging $29.95. Is it worth it? News 4's Suzanne McCarroll is here with more on the story.

NBC then reported that some medical ethicists say that this is "really exploiting people's fear of death." After noting that the University of Colorado Health Sciences Cen-

---

**1.** NBC Subsidiary (KCNC–TV), Inc., and reporter Suzanne E. McCarroll will be referred to collectively as NBC.

**2.** In its answer brief, LWC argues that the trial court erred in "accepting as true the unsupported assertions of [NBC] in their Motion to Dismiss contrary to Plaintiffs' sworn allegations in the Verified Complaint" and in failing to give LWC "any notice or opportunity to present affidavits, testimony or other evidence."

These questions were never presented to us for certiorari review and we did not grant certiorari to review these alleged procedural errors. Accordingly, we do not address them.

**3.** The full transcript of these broadcasts is reprinted as an appendix to the court of appeals opinion. See *Living Will Center*, 857 P.2d at 521–24.

ter had sent out 10,000 living will forms free of charge, the broadcast included an interview with the president of LWC who stated the form in the packet was "done on a stronger piece of paper." The broadcast went on to state that the president admitted his form was the same as that supplied free of charge by hospitals and libraries, but that he claimed that LWC's print was bigger, came with a quarterly newsletter, a wallet identification card "so people know you have a living will," and a durable power of attorney form. The broadcast then noted that the same form for a durable power of attorney was available free of charge at a local hospital. The broadcast additionally reported that the packet includes a medical directive form which was characterized by LWC's president as a "road map for the patient," but not a legal document.

The broadcast continued with a brief commentary by Dr. Frank Marsh, an employee of the University of Colorado School of Medicine who was represented as a "medical ethicist." His first statement was, "I think it's a scam." The report then summarized his view as follows: "He says the medical directive and power of attorney forms are unnecessary, certainly not worth paying for." Marsh then stated: "[T]hey will send in $29.95 and what they get back is they've been taken—is what it amounts to—totally taken."

The broadcast then stated that many in the medical ethics community say the forms provided free of charge "are really all you need" to implement an effective living will. The broadcast concluded by noting that LWC's president was neither a doctor nor a lawyer, but an "entrepreneur."

The president of LWC challenged the content of the first broadcast claiming, among other things, that some of the forms were not available at the locations identified by NBC. In response, NBC broadcast another story on living wills and LWC. The second broadcast included a short summary of the first report and stated that, "we showed you one company in town that charged $29.95 for a living will kit. Now that kit includes a living will, a durable power of attorney, and a medical directive form." The second broadcast included Marsh's statement that the medical directive form was unnecessary. The broadcast continued with more information regarding other institutions which provided forms similar or identical to LWC's at little or no cost.

LWC brought this action asserting numerous claims including that NBC's broadcast was libelous. It claimed that virtually the entire broadcasts were defamatory and not constitutionally privileged.[4] NBC filed a motion to dismiss which was converted to a motion for summary judgment and granted by the trial court. The trial court held that NBC's broadcast characterizing LWC's packet as "a scam" and to its customers as being "taken" were constitutionally privileged and thus, not actionable in a suit for defamation. It also concluded that the substance and gist of the broadcasts was true and thus, not actionable in a defamation suit.[5]

The court of appeals reversed, concluding that the terms "scam" and "totally taken," when considered in the context of the broadcast as a whole, implied material assertions of fact susceptible to being proved false.

4. At oral arguments before this court, defense counsel noted the difficulty encountered in defending against this suit because it was never entirely clear exactly what language in the broadcasts plaintiff alleged was defamatory. In response to continued questioning to clarify this ambiguity, counsel for plaintiff focused primarily on Dr. Marsh's statements that LWC's product was a "scam" and its customers as being "taken." Plaintiff's counsel also argued that the general tenor or gist of the two broadcasts was defamatory and that a number of factual inaccuracies regarding the availability of certain forms at particular locations was defamatory.

Both lower courts focused exclusively on Dr. Marsh's statements and the general tenor of the broadcasts. These are the same remarks and implications that both parties have focused on in their briefs to this court. Accordingly, these are the issues we focus on here. However, because plaintiff has argued that the factual inaccuracies are defamatory, we also consider this claim.

5. The trial court determined that the broadcasts related to a matter of public interest and therefore, the requirements of falsity and actual malice or reckless disregard of the truth applicable to defamation claims applied to LWC's claims. These determinations are not before us.

*Living Will Center*, 857 P.2d at 518–19.[6] It additionally concluded that the gist of each of the broadcasts implied a material assertion of fact capable of being proved false. "Thus," the court of appeals held, "the telecast does not fall within the protection of the First Amendment for statements containing no provable false factual connotation." *Id.* at 519. It did not reach the trial court's second conclusion that the substance and gist of the broadcasts was true and not actionable.

## II

In order to decide the issues presented we must first identify the appropriate standard for evaluating when defamatory statements are constitutionally protected under the First Amendment to the United States Constitution and article II, section 10 of the Colorado Constitution and thus are not actionable.

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974), the United States Supreme Court stated:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

These words were widely regarded as establishing the principle that statements of "pure" opinion are constitutionally privileged and thus, not actionable in a defamation case. *See, e.g., Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280 (4th Cir.1987); *Janklow v. Newsweek, Inc.*, 788 F.2d 1300 (8th Cir.), *cert. denied*, 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986); *Burns v. McGraw–Hill Broadcasting Co.*, 659 P.2d 1351 (Colo.1983). *See also Ollman v. Evans*, 750 F.2d 970, 974 n. 6 (D.C.Cir. 1984) (citing federal cases recognizing an opinion privilege), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985); Jef-

frey E. Thomas, Comment, *Statements of Fact, Statements of Opinion, and the First Amendment*, 74 Calif.L.Rev. 1001, 1009 n. 52 (1984) (listing state cases recognizing an opinion privilege).

In applying the principle of *Gertz*, this court like many others adopted a contextual test in order to determine whether a statement was one of fact or opinion. In *Burns*, we considered: first, whether the statement is cautiously phrased in terms of apparency; second, the entire published statement in context, not just the objectionable word or phrase; and third, all the circumstances surrounding the statement, including the medium through which it is disseminated and the audience to whom it is directed. *Burns*, 659 P.2d at 1360 (quoting from *Information Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781 (9th Cir.1980)). We also noted, however, that not all statements of opinion are constitutionally privileged. Rather, we held that "opinions which imply the existence of an undisclosed defamatory factual predicate may support a cause of action in defamation.... when 'the average reader or listener or viewer perceive[s] the comment as essentially an assertion of fact....'" *Id.* (quoting Alfred Hill, *Defamation and Privacy Under the First Amendment*, 76 Colum.L.Rev. 1205, 1234 n. 133 (1976)). *See also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18, 110 S.Ct. 2695, 2705, 111 L.Ed.2d 1 (1990) ("If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth.").

After our decision in *Burns*, however, the United States Supreme Court decided *Milkovich*, where it rejected the "artificial dichotomy" between fact and opinion and repudiated any "so-called opinion privilege *wholly in addition*" to existing first amendment protections. *Id.* at 19, 24, 110 S.Ct. at 2706, 2708–09.[7] Nevertheless, the Court rea-

6. The court of appeals stated: "The trial court dismissed plaintiff's complaint based solely on its conclusion that the broadcasts did not imply any statement of material fact susceptible of being proved false. This is the only issue the parties have addressed on appeal, and our review will be

limited to that issue." *Living Will Center*, 857 P.2d at 517.

7. The Court explained that the often-quoted passage from Gertz, when read in context, "was merely a reiteration of Justice Holmes' classic 'market place of ideas' concept." *Milkovich*, 497

soned that in order to insure "uninhibited, robust, and wide-open" debate on matters of public concern, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation," or which "cannot 'reasonably [be] interpreted as stating actual facts' about an individual," continues to receive full constitutional protection. *Id.* at 20, 110 S.Ct. at 2706 (citing *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), and *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)).

Under the *Milkovich* standard, therefore, a court must determine whether the statement contains or implies a verifiable fact about the plaintiff and second, whether the statement reasonably is susceptible to being understood as an assertion of actual fact. In so doing, the factors identified by the *Burns* court for distinguishing between facts and opinions remain applicable under the *Milkovich* test. *See, e.g., Phantom Touring, Inc. v. Affiliated Publications,* 953 F.2d 724 (1st Cir.) (*Burns–* type factors relevant in applying *Milkovich* standard), *cert. denied,* —— U.S. ——, 112 S.Ct. 2942, 119 L.Ed.2d 567 (1992); *Partington v. Bugliosi,* 825 F.Supp. 906, 919 (D.Hawaii 1993) (*Milkovich* does not "represent a departure from established Ninth Circuit law"); *Lyons v. Globe Newspaper Co.,* 415 Mass. 258, 612 N.E.2d 1158, 1163 (1993) ("nothing in *Milkovich* requires us to alter the principles of [Massachusetts] law...."). *See also The Supreme Court—Leading Cases, 1989 Term,* 104 Harv.L.Rev. 129, 219 (1990) ("Because the criteria used by lower courts ... to distinguish fact from opinion are consistent with *Milkovich*'s limitations, the law of defamation will remain

essentially the same...."). *But see Weller v. American Broadcasting Companies, Inc.,* 232 Cal.App.3d 991, 283 Cal.Rptr. 644, 649 (1991) (suggesting that *Milkovich* lessened the constitutional protection provided for "opinions").

In fact, the majority's reasoning and analysis in *Milkovich* strongly support the conclusion that the factors identified in *Burns* remain applicable under *Milkovich. Moldea v. New York Times Co.,* 22 F.3d 310 (D.C.Cir. 1994) (amending its earlier decision and concluding that *Milkovich* cannot be read to have "abandoned the principle of looking to the context in which speech appears" when determining if it is constitutionally privileged). The *Milkovich* court reasoned that recognition of an "opinion" privilege was unnecessary to insure freedom of speech because "the breathing space which freedoms of expression require in order to survive ... is adequately secured by existing constitutional doctrine...." *Milkovich,* 497 U.S. at 19, 110 S.Ct. at 2706 (citations and quotations omitted). In so holding, the Court specifically endorsed the *Bressler–Letter Carriers–Falwell* line of cases. In each of those decisions, the court expressly considered the statements as a whole, as well as the broader social context in which they arose.[8] The *Milkovich* court considered whether the statements at issue were the sort of loose, figurative, or hyperbolic language which would negate the impression that the statements were factual, as well as the general tenor of the statements in determining they were not constitutionally privileged. *Milkovich,* 497 U.S. at 20–21, 110 S.Ct. at 2706–07.

■ Consequently, we conclude that the analysis adopted in *Burns* remains applicable in determining whether allegedly defamatory

---

U.S. at 18, 110 S.Ct. at 2705. As such, the Court concluded that the "passage from *Gertz* was [not] intended to create a wholesale defamation exception for anything that might be labeled 'opinion.'" *Id.*

8. Justice Brennan, in his dissenting opinion in Milkovich, noted that the majority's analysis demonstrated the continued applicability of the factors applied in *Burns:*

> Among the circumstances to be scrutinized by a Court in ascertaining whether a statement purports to state or imply "actual facts about an individual" ... are the same indicia that

lower courts have been relying on for the past decade or so to distinguish between statements of fact and statements of opinion: the type of language used, the meaning of the statement in context, whether the statement is verifiable, and the broader social circumstances in which the statement was made.

*Milkovich,* 497 U.S. at 24, 110 S.Ct. at 2709 (Brennan, J., dissenting). While agreeing with the majority's legal conclusion, he rejected the Court's narrow application of these factors to the statements at issue in *Milkovich.*

statements are constitutionally privileged. In determining whether such a statement is actionable, a court must determine whether the statement is one "of opinion relating to matters of public concern which does not contain a provably false factual connotation," or which "cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich*, 497 U.S. at 20, 110 S.Ct. at 2706. In making this inquiry, relevant considerations include the phrasing of the statement, the context in which it appears, the medium through which it is disseminated, the circumstances surrounding its publication, and a determination of whether the statement implies the existence of undisclosed facts which support it. *Milkovich*, 497 U.S. at 18, 110 S.Ct. at 2705; *Burns*, 659 P.2d at 1360. *See also Sunshine Sportswear & Elec. Inc. v. WSOC Television, Inc.*, 738 F.Supp. 1499 (D.S.C.1989).

■ Whether allegedly defamatory language is constitutionally privileged is a question of law and a reviewing court must review the record *de novo* to insure that the trial court's judgment does not constitute a forbidden intrusion on the field of free expression. *Milkovich*, 497 U.S. at 17, 110 S.Ct. at 2704–05; *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 1958–59, 80 L.Ed.2d 502 (1984); *Kuhn v. Tribune–Republican Publishing Co.*, 637 P.2d 315, 318 (Colo.1981).

## III

■ Applying these standards to the broadcasts at issue here, we are convinced that the terms "scam" and "taken" as well as the substance and gist of the broadcasts neither contain or imply a verifiable fact nor can they reasonably be understood as an assertion of actual fact about LWC's product.

Therefore, we hold that the broadcasts are constitutionally privileged.

### A

The first statement complained of by LWC, "I think it's a scam," is phrased in terms of Dr. Marsh's estimation regarding the worth of LWC's product. It is an expression of his belief that the packet is not worth $29.95. This is made clear given that his statement uses the language of apparency: "I think." While a statement of belief or opinion may imply the existence of a false and defamatory fact, *Milkovich*, 497 U.S. at 20, 110 S.Ct. at 2706–07, Marsh's subjective evaluation of the packet's worth does not carry any such implication. To the contrary, it is nothing more than his judgment that people need not pay for a living will packet because they can get a living will free: He stated that the power of attorney and medical directive forms "were not necessary," expressed his advocacy of the use of living wills, and his assessment that persons seeking to adopt a living will "don't need to pay a penny—not one red cent" to do so.

The fact that the term "scam" can, as plaintiff argues, be defined, does not change this conclusion. *Webster's Ninth Collegiate Dictionary* defines a scam as "a fraudulent or deceptive act or operation." *Id.* at 1047 (1990).[9] However, the question is not whether the statement can be defined (after all, all words can be defined), but whether the statement contains or implies a verifiable assertion of fact or can reasonably be understood as stating an actual fact. "A word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and time in which it is used." *Towne v. Eisner*, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918). Nothing in the

9. In her dissenting opinion, Judge Rothenberg argued that the term "scam" was privileged because it constituted rhetorical hyperbole. As supporting authority for this conclusion Judge Rothenberg cited, inter alia, the following:
   *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 728 (1st Cir.1992) (critic who described musical comedy version of Broadway show as a "rip-off, a fraud, a scandal, a snake-oil job" did not commit libel because commentary was "figurative and hyperbolic" and there is "no objective evidence to disprove it;" terms "fake" or "phony" similarly unprovable since they "admit of numerous interpretations"); *McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir.1987) ("The lack of precision makes the assertion 'X is a scam' incapable of being proven true or false.").
   *Living Will Center*, 857 P.2d at 521 (Rothenberg, J., dissenting).

broadcasts generally, or in Marsh's statement in particular, even remotely suggests that LWC is committing the crime of fraud or that it is engaged in a deceptive commercial practice. To the contrary, he is simply expressing his estimation of the worth of that product, and doing so in figurative and hyperbolic terms. In *Milkovich,* the Supreme Court expressly endorsed a line of prior cases which "provide[ ] protection for statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual. This provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich,* 497 U.S. at 20, 110 S.Ct. at 2706. As used by Dr. Marsh, the term "scam" amounts to nothing more than a subjective judgment regarding the value of the LWC packet, expressed in imaginative and hyperbolic terms, and as such, it neither contains or implies a verifiable fact nor can it reasonably be understood as an assertion of actual fact. *See infra* pp. 14–15.

Reading the statement in context supports this conclusion. The broadcast explains in some detail the content and purposes of LWC's packet and provides information on where some of the forms contained in that packet can be obtained at little or no cost. The broadcast indicates that while not everything in the packet is available from those sources, everything that one "really needs" to implement a living will is. In this context, Marsh's estimation that the sale of the packet is a "scam" only reinforces what the phrasing of the statement itself indicates: a living will can be acquired at little or no cost, LWC charges $29.95 for its packet which enables the purchaser to obtain a living will, and given these facts, Marsh believes that the packet is not worth $29.95. In addition, the broadcast summarizes the view of Marsh and others as follows: "it's not that there is anything wrong with these forms [in the LWC packet], they are just saying that $29.95 is an unnecessary charge for a service provided free of charge in the community." There is no suggestion that LWC is perpetrating a fraud or deceiving the public with respect to its product. Rather, the broadcast simply notes the cost of LWC's product and

compares it with alternative sources for obtaining a living will.

Finally, Marsh's statement was based on facts disclosed in the broadcast, i.e., the price of LWC's packet, its content, and the availability of a living will and power of attorney forms elsewhere. The viewers were alerted to the fact that LWC's packet contained forms, information, and services in addition to the forms available at little or no cost; however Marsh's opinion, which was formed after "reviewing the forms [in the packet]," was based on the judgment that the living will form alone "was all you really need" to execute a valid living will. Thus, his opinion was based on facts disclosed to the viewer. There is no hint that it was based on undisclosed information. Viewers were in a position to evaluate Marsh's views, and were free to form a judgment about LWC's product that differed from his.

> [*Milkovich* ] unquestionably excludes from defamation liability not only statements of rhetorical hyperbole—the type of speech at issue in the *Bressler–Letter Carriers–Falwell* cases—but also statements clearly recognizable as pure opinion because their factual premises are revealed. Both types of assertions have an identical impact on readers—neither reasonably appearing factual—and hence are protected equally under the principles espoused in *Milkovich.*

*Phantom Touring, Inc. v. Affiliated Publications,* 953 F.2d 724 731 n. 13 (1st Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 2942, 119 L.Ed.2d 567 (1992).

In short, the broadcast provided sufficient information for viewers to answer for themselves the question which opened the broadcast: "Is it worth it?"

When analyzed under the test articulated above, the statement "I think it's a scam" does not contain or imply a verifiable fact nor can it reasonably be understood as an assertion of actual fact about LWC's product. Accordingly, we conclude that the statement is constitutionally privileged.

B

For similar reasons, we conclude that Marsh's statement, "they will send in $29.95 and what they get back is they've been taken—is what it amounts to—totally taken," is also constitutionally privileged. Again, the statement reflects Marsh's judgment regarding the desirability of purchasing LWC's packet. Characterizing the purchase of LWC's packet as being "totally taken" is nothing more than a rhetorical and hyperbolic expression of Marsh's view that a valid and effective living will can be acquired at little or no cost and therefore, it is simply not worth paying $29.95 to achieve this end. As the broadcast itself stated, Dr. Marsh "advocates the use of living wills, but he does not advocate paying for the practice."

IV

The second issue on which we granted certiorari is whether the court of appeals erred in failing to review the trial court's determination that the substance and gist of the two broadcasts was true and if so, whether that determination was correct. The question is premised on the conclusion that the substance and gist of the two broadcasts implied a verifiable assertion of fact. Because we conclude that the substance and gist of the two broadcasts, like Marsh's statements, does not imply verifiable facts, we need not address whether the court of appeals should have reviewed the trial court's finding that the implication of the broadcasts was true, because the truth of that implication cannot be determined.

The court of appeals concluded that the substance and gist of the two broadcasts contained a verifiable implication and identified that implication as follows:

[A] company with no expertise is packaging and selling information, forms, and services which, individually or collectively, are not worth paying anything for, because everything in the package can be obtained at little or no cost elsewhere or is unnecessary to meet the needs of the public. The report ... implies that everything in plaintiff's package worth paying anything for

has been fully disclosed during the telecast.

*Living Will Center,* 857 P.2d at 520.

We conclude that the court of appeals erred in its identification of the implications of the broadcasts.

The court of appeals concluded that the first broadcast implied that LWC is a "company with no expertise...." on the grounds that LWC's president was characterized not as a lawyer or doctor, but an "entrepreneur." An entrepreneur is defined as "the organizer of an economic venture...." *Webster's Third New International Dictionary* 759 (1986). Only by imputing an unwarranted pejorative connotation to that term can the implication identified by the court of appeals be drawn. After all, Henry Ford could be, and often is, characterized as an entrepreneur, but who would think that doing so implies that the Ford Motor Company has no expertise in manufacturing automobiles? Furthermore, the broadcast expressly states the views of Marsh and others as opining not "that there is anything wrong with these forms [in the LWC packet]," but only "that $29.95 is an unnecessary charge for a service you can provide or find free of charge in the community." Thus, not only does the implication drawn by the court of appeals not follow from use of the term "entrepreneur," the statement "that there is [not] anything wrong with the forms" in the packet clearly negates any conceivable negative implication that might flow from that term.

The court of appeals concluded that the second broadcast implied this same verifiable fact. In reaching that conclusion, however, it failed to identify any language which either expressly or implicitly supports this conclusion, and LWC points to none. Furthermore, we are unable to discern anything in the second broadcast which raises such an implication. Accordingly, we conclude that the broadcasts do not imply that LWC is a company "with no expertise" in developing the product it sells.

Similarly, the court of appeals erred in concluding that the broadcasts implied that the packet "was not worth paying *anything* for." (emphasis added). This is made clear by noting that the broadcasts expressly in-

formed viewers that "the Harvard Medical School sends out a living will packet for $5.00." Thus, the implication was not that LWC's packet was not worth paying anything for, just that it was not necessary to pay $29.95 to obtain a living will which could either be acquired free or at a nominal charge. Moreover, while the first broadcast stated that the forms provided free of charge in the community were "all that you really need," it neither stated nor implied that the additional forms or services provided with LWC's packet were entirely worthless. It might be true to say that a "for sale" sign is all one really needs to sell a home, but this statement does not imply that the services of a real estate agent are not worth paying anything for. The same principle holds true here. The broadcasts do not imply that LWC's packet was not worth paying anything for.

Finally, we disagree with the court of appeals that the broadcasts implied the verifiable fact "that everything in plaintiff's package worth paying anything for has been fully disclosed during the telecast." The broadcasts specifically noted that a number of forms and services were provided with LWC's packet that were never represented as being available from other sources at little or no cost. To the extent that the broadcasts implied that everything worth paying for had been disclosed, this implication was based on the judgment that the living will form was all that was needed to implement a living will. Thus, we conclude that the broadcasts did not imply that anything worth paying for in the packet had been fully disclosed.

In contrast to the court of appeals conclusion, we hold that the gist of the two broadcasts does not contain or imply a verifiable assertion of fact nor could it reasonably be understood as an assertion of actual fact. Thus, we conclude that the gist of the two broadcasts is constitutionally privileged. Ac-

cordingly, we need not address whether the gist of those broadcasts is true.

The implication of each of the broadcasts is that it is not worth paying $29.95 for LWC's packet (the sale of which is a "scam") in order to properly implement a living will because that can be achieved by getting the forms necessary to do so at little or no cost (i.e., those who pay $29.95 for the packet are being "taken").[10] The implication arises from the juxtaposition of the disclosed facts that living will forms were available at little or no cost from local hospitals and libraries, that many medical ethicists were of the opinion that this form was all that was needed to implement a valid living will, and that LWC charged $29.95 for its product. The broadcast begins by raising the question, "Is it worth it?" The implication is that it is not.

Clearly this implication is not a verifiable fact. The worth of a given service or product is an inherently subjective measure which turns on myriad considerations and necessarily subjective economic, aesthetic, and personal judgments. Is it worth it to have the personal identification card, durable power of attorney, and newsletter even though the only thing one "really needs" to execute a living will is a living will form? Is it worth paying that amount for the convenience of having a company send one its living will packet if one does not have the time or motivation to visit a local hospital and get a form for oneself? The answers to these questions clearly are not verifiable. As such, we conclude that the truth of this implication need not and cannot be determined. The implication of the two broadcasts is not verifiable and thus, that implication is constitutionally privileged.

## V

We turn last to plaintiff's argument that a number of factual inaccuracies in the

---

10. The trial court concluded that the implication to be drawn from each of the telecasts was that "there are alternatives [to LWC's product] available at substantially less cost or no cost that accomplish the same purposes and ends." We disagree. The implication of the telecast was broader than this. For instance, the telecast indicated that LWC's packet included a newsletter, central registry, and identification card "so

people know you have a living will." There was never any indication, however, that these same things were available elsewhere. Thus, it was not implied that the "same purposes and ends" were available from other sources but only that alternatives were available at substantially less cost or at no cost for executing a living will—the implication being that it is not necessary to pay $29.95 for the packet.

two broadcasts are defamatory. The plaintiff argues that not all of the forms identified in the report as being available at particular locations were in fact available there [11] and that not every aspect of the packet was fully disclosed in the broadcasts.

Assuming, as we must on a motion for summary judgment, that not all of the forms identified in the broadcasts were available at the locations mentioned, *see Dawson v. Reider,* 872 P.2d 212, 213 n. 2 (Colo.1994), this fact cannot conceivably be regarded as defamatory to LWC. As common sense suggests, an allegedly defamatory remark is not actionable if it cannot reasonably be understood as an assertion of actual fact *pertaining to the plaintiff. See* Restatement (Second) of Torts § 564 (1977) ("A defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer"). Whether or not a given hospital provides a particular form cannot reasonably be understood as a defamatory remark about LWC.[12]

■ As for the allegation that LWC was defamed by NBC's failure to fully describe each and every feature and aspect of the LWC packet, we again fail to see how providing limited, though accurate, information about the packet can be regarded as a defamation of LWC under the facts of this case. Furthermore, we decline to condemn or condone the editorial judgments of NBC in determining the scope and specificity of these broadcasts. In this respect, the observations of the Eight Circuit in *Janklow v. Newsweek,* 788 F.2d 1300 (8th Cir.1986), are instructive:

Every news story (like every judicial opinion) reflects choices of what to leave out, as well as what to include. We can agree

that this story would have been fairer to [plaintiff] and more informative to the reader if the chronology ... had been more fully explained.... Courts must be slow to intrude into the area of editorial judgment not only with respect to choices of words, but also with respect to inclusions in or omissions from news stories. Accounts of past events are always selective, and under the First Amendment the decision of what to select must almost always be left to writers and editors. It is not the business of government.

*Id.* at 1306. *See also Lauderback v. ABC,* 741 F.2d 193 (8th Cir.1984), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 961, 83 L.Ed.2d 967 (1985); *Saenz v. Playboy Enterprises, Inc.,* 653 F.Supp. 552, 572 (N.D.Ill.1987); *Reliance Ins. Co. v. Barron's,* 442 F.Supp. 1341, 1352 (S.D.N.Y.1977).

## VI

The broadcast statements of Dr. Marsh are constitutionally privileged because they neither contain or imply a verifiable fact nor can they reasonably be understood as an assertion of actual fact. The implication of the two broadcasts is constitutionally privileged because it is not a verifiable fact nor can it reasonably be understood as an assertion of actual fact. Accordingly, the judgment of the court of appeals is reversed and the case remanded to that court with directions to reinstate the trial court's entry of summary judgment in favor of NBC.

ERICKSON, J., dissents, and KIRSHBAUM and SCOTT, JJ., join in the dissent.

SCOTT, J., dissents, and ERICKSON and KIRSHBAUM, JJ., join in the dissent.

---

11. It is not disputed that living will forms that are *virtually identical to the form provided by* LWC were available at a number of the locations identified in the NBC reports.

12. Of course these factual inaccuracies may be *relevant inasmuch as the availability of living* will forms similar or identical to those contained in LWC's packet is what constitutes the basis for the implication that the packet is not worth paying for and explains Dr. Marsh's judgment that the sale of the packet is a "scam" and its consumers are "taken." However, plaintiff does not contend that no living will forms are available

free of charge or that those free forms are significantly *different from that provided by LWC.* In fact, the exhibits attached to plaintiff's verified complaint clearly would negate such an assertion. While any factual inaccuracies in the broadcasts may reflect on NBC's credibility and accuracy in reporting, they do not change the essential fact that the implication of NBC's report and the judgments of Dr. Marsh are based on disclosed (though partially inaccurate) facts, nor do they have any defamatory connotation with respect to LWC.

Justice ERICKSON dissenting:

I dissent because I would affirm the court of appeals in *Living Will Center v. NBC Subsidiary (KCNC–TV), Inc.*, 857 P.2d 514, 517 (Colo.App.1993), and remand for further proceedings. I agree with the majority's exposition of the law concerning the actionability of a claim for defamation. However, the trial court erred in denying the plaintiffs the opportunity to develop the factual predicate for their claim before ruling on the defendants' motion to dismiss. Accordingly, I respectfully dissent.

The defendants filed a motion to dismiss that the trial court treated as a motion for summary judgment. Based solely on the complaint, the trial court ruled that the publication of the statement that the business was a "scam" as well as the statement that people were being "taken" were constitutionally protected opinions. As a result of this ruling, the trial court entered summary judgment for the defendants. The plaintiffs appealed and the court of appeals held that the trial court erred because: "The trial court dismissed the plaintiff's complaint solely on its conclusion that the broadcasts did not imply any statement of material fact susceptible of being proved false." *Living Will Center*, 857 P.2d at 517. Accordingly, the court of appeals reversed and remanded for further proceedings.

In its answer brief to this court, the Living Will Center (LWC) asserts that the trial court entered summary judgment based on unsupported and incomplete assertions of fact and claims that it was denied the opportunity to establish the actionability of the claim. The majority dismisses this contention, however, because the issue was not presented to us for certiorari review. *See* Maj. op. at 7 n. 2. In my view, the adequacy of the record to support the entry of summary judgment is the first issue that must be resolved. The trial court's entry of summary judgment when factual questions were unresolved was reversible error. *See Civil Service Comm'n v. Pinder*, 812 P.2d 645, 649 (Colo.1991) (stating that summary judgment is a drastic remedy and proper only when there is no genuine issue of material fact); *Schuster v. Zwicker*, 659 P.2d 687, 690 (Colo.

1983) (noting the discretionary authority to review cases under C.A.R. 1(d) notwithstanding the failure to preserve an issue); *Jones v. Dressel*, 623 P.2d 370, 373 (Colo.1981) (holding that summary judgment is a drastic remedy not available when there remain genuine issues of material fact).

In this case, none of the parties had the opportunity to address the issues relevant to the determination of the actionability of the defamation claim under the standards developed in *Burns v. McGraw–Hill Broadcasting Co.*, 659 P.2d 1351 (Colo.1983). The factors identified in *Burns* that establish whether *reasonable* people would believe that the statement was one of fact, i.e., the phrasing, the context, and the circumstances surrounding the statement, all require evidence to facilitate the legal determination of the trial judge. Actionability requires review of the relevant evidence of the statement's broader context. Here, the trial court stayed all discovery at the request of the defendants and did not consider matters outside of the pleadings. Therefore, the trial court denied LWC access to the defendants' original unedited video and audio tapes, and deprived LWC of the opportunity to present affidavits, testimony, or other evidence. Although LWC appended several exhibits to its complaint, the pleadings were not enough to establish *as a matter of law* that the reasonable person standard set forth in *Burns* was met. For the reasons set forth in Justice Scott's dissent, I also join his dissent. Because summary judgment precluded the plaintiff from establishing the constitutional foundation required in *Burns*, the court of appeals should be affirmed.

I am authorized to say that Justice KIRSHBAUM and Justice SCOTT join in this dissent.

Justice SCOTT dissenting:

Today, contrary to our rules of civil procedure the majority permits trial courts to dismiss civil actions for defamation by grant of a motion for summary judgment, without permitting the opponent of such a motion the opportunity to establish whether a genuine issue of material fact exists. The majority reaches its holding after a fact-based analy-

sis, including examination of "the context" in which the statement appears and "the circumstances surrounding its publication," maj. op. at 11. Because our rules of procedure counsel against premature dismissal on motions for summary judgment, I respectfully dissent from the majority's opinion and its judgment. In light of the procedural posture of this case, I would affirm the judgment of the court of appeals with directions to return the case to the trial court for further proceedings.

In my opinion the trial court erred in ruling on NBC's motion for summary judgment, after converting it from a motion to dismiss, without giving the Living Will Center (LWC) an opportunity to present affidavits, testimony, or other evidence in opposition to the defendant's motion. I recognize that this issue was not specified for review in our grant of certiorari, see maj. op. at 7 n. 2, however, we are to review the trial court's summary judgment order, which necessarily requires an examination of the standard applied as well as the procedure utilized by the trial court in granting that order.

The majority opinion accurately sets forth the facts regarding the claim. However, a brief review of the procedural posture surrounding the trial court's decision to grant the motion for summary judgment is helpful. On May 9, 1991, LWC filed a forty-five page verified complaint which incorporated by reference some 25 exhibits, consisting of 65 pages of text plus a videotape of the two broadcasts which are the subject of this action. Discovery was simultaneously commenced as LWC served with the complaint a first set of interrogatories, requests for production, and requests for admissions. A second set of interrogatories was served on NBC on May 30, 1991. However, on June 20, 1991, NBC moved for a protective order and on July 1, 1991, the trial court imposed a stay upon discovery by LWC, pending a ruling on NBC's motion for a protective order. The stay order remained in effect throughout the entire course of the litigation.

Shortly after the trial court stayed discovery, NBC filed a motion to dismiss LWC's complaint for failure to state a claim upon which relief could be granted pursuant to C.R.C.P. 12(b)(5). Without notifying the parties and without providing any opportunity to respond by affidavit or to engage in discovery, the trial court converted the Rule 12(b)(5) motion into a motion for summary judgment pursuant to C.R.C.P. 56, and granted the motion.

It is settled law that a court may not consider matters outside the allegations in the complaint when ruling on a motion to dismiss for failure to state a claim. C.R.C.P. 12(b); *Dunlap v. Colo. Springs Cablevision, Inc.,* 829 P.2d 1286, 1290 (Colo.1992). If matters outside of the pleadings are presented to and not excluded by the trial court, a Rule 12(b)(5) motion shall be treated as one for summary judgment pursuant to C.R.C.P. 56. C.R.C.P. 12(b); *Dunlap,* 829 P.2d at 1290. Where a motion to dismiss is converted to a motion for summary judgment, the court should give notice and a reasonable opportunity to present affidavits, documentation, and all other material pertinent to a motion made under Rule 56. C.R.C.P. 12(b); *Dunlap,* 829 P.2d at 1290; *Wheeler v. Hurdman,* 825 F.2d 257, 260 (10th Cir.), *cert. denied,* 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987); *Nichols v. United States,* 796 F.2d 361, 364 (10th Cir.1986); *Ohio v. Peterson,* 585 F.2d 454, 457 (10th Cir.1978), *affirmed after remand,* 651 F.2d 687, *cert. denied,* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981); *Davis v. Howard,* 561 F.2d 565, 571 (5th Cir.1977); *see also Moore's Federal Practice,* §§ 12.09(3) & 56.-02(3).[1]

Without fair notice to LWC, the trial court converted the motion to dismiss to a motion for summary judgment. Regardless of whether this conversion was appropriate, *see Willer v. City of Thornton,* 817 P.2d 514, 521 (Colo.1991) (finding that there are circumstances where matters outside of the pleadings have not been presented or considered by the court, where a motion to dismiss may

1. Unlike the federal rules, the Colorado Rules of Civil Procedure do not specify how many days notice must be provided the party defending a motion for summary judgment. In most other respects, Rules 12 and 56, C.R.C.P., are virtually identical to their federal counterparts.

still be treated as a motion for summary judgment), the trial court was then obligated to provide notice to the parties and to allow LWC an opportunity to oppose the summary judgment motion. Instead, reasoning that the discovery sought by LWC was not relevant to the grounds on which summary judgment was granted, the trial court granted the motion and found that "plaintiff has been given a reasonable opportunity to present all material pertinent to the motion."[2]

A trial court's speculation as to what information LWC might obtain through discovery had the stay been lifted to permit a free and fair opportunity to oppose the motion cannot be a valid rationale for its grant of summary judgment. In *Finn v. Gunter*, 722 F.2d 711 (11th Cir.1984), the Eleventh Circuit Court of Appeals was faced with a situation similar to that presented in the instant case. The trial court converted a motion to dismiss into a motion for summary judgment and granted the motion without providing notice to the parties. On appeal, the court rejected the contention that the party opposing the motion would not have provided additional relevant information in opposition to the motion had notice been provided. The court held as follows:

> Appellee argues that Finn has already provided everything that he could. Appellant says there is additional material that can and will be filed. What is important is that Finn must be given an opportunity to present every factual and legal argument available. Proper procedures must be followed. We will not speculate on what action the parties will take nor the possible ruling by the trial court. Nor do we make

any comments upon the merits of the claims presented.

*Id.* at 713.

In my opinion, the majority's affirmance of the trial court's holding serves to erode the stringent procedural protections contemplated by our rules of procedure and which must be afforded a party defending against a motion for summary judgment.

Summary judgment is a "drastic remedy" and should be granted only upon a clear showing that there is not genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. C.R.C.P. 56; *Peterson v. Halsted*, 829 P.2d 373 (Colo.1992). Summary judgment is only proper when the pleadings, affidavits, depositions, or admissions show that there is no genuine issue as to any material fact. *Civil Service Comm'n v. Pinder*, 812 P.2d 645 (Colo.1991). Because it results in a final decision on the merits, dismissal of an action under summary judgment bars subsequent actions on the same claim.[3] *Winslow v. Walters*, 815 F.2d 1114, 1116 (7th Cir.1987). As a consequence, the non-moving party is entitled to the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts, and all doubts must be resolved against the moving party. *Casebolt v. Cowan*, 829 P.2d 352 (Colo.1992).

Where such a drastic remedy is at stake, a trial court should resolve the issue against a full and complete factual record. *Masri v. Wakefield*, 602 F.Supp. 404 (D.Colo.1983). This court has previously held that a refusal to grant a reasonable continuance to permit discovery before granting summary judgment is reversible error. *Miller v. First*

---

**2.** Summary judgment was granted based on the trial court's determination that the overall gist of the broadcast was true and that the comments made by Dr. Marsh were not reasonably interpretable as actual assertions of verifiable fact. The trial court found that the discovery requested by LWC was relevant only to the state of mind of the reporter who relayed the story, an issue not pertinent to the reasons for the dismissal.

**3.** Unlike a ruling on a motion to dismiss pursuant to C.R.C.P. 12(b)(5), a ruling on a motion for summary judgment is a determination on the merits of the case. As stated in *Finn,*

A motion to dismiss may result in a rejection of the complaint but it does not finally resolve the case. When this type of motion is before the court, counsel are generally addressing questions of law. A summary judgment, on the other hand, carries far greater impact since it results in a final adjudication of the merits. "The very intimation of morality when summary judgment is at issue assures us that the motion will be rebutted with *every factual and legal argument available.*"

(Citation omitted) (emphasis added).

*National Bank of Englewood,* 156 Colo. 358, 399 P.2d 99, 101 (1965).

In this case, the trial court unfairly deprived LWC of the opportunity to defend itself against a judgment on the merits of the case. The record—limited by the stay—is insufficient to allow a determination as to whether there is a genuine issue of material fact. Mere argument contained in a memorandum in opposition to a motion to dismiss is a far cry from "material made pertinent" by a motion for summary judgment; the material made pertinent by the summary judgment rule includes such things as depositions, answers to interrogatories, admissions on file, affidavits and the like. *Peterson,* 585 F.2d at 457 (10th Cir.1978).

I am at a loss as to what authority exists to support the trial court's grant of summary judgment premised upon speculation as to what information LWC would seek to discover. I express no opinion on the ultimate judgment of the trial court. I simply believe that summary judgment should not have been granted without affording LWC notice and an opportunity to oppose the summary judgment motion.

Accordingly, I respectfully dissent. I also join the dissent of Justice Erickson.

I am authorized to say that Justice ERICKSON and Justice KIRSHBAUM join in this dissent.