Bryan GORDON and Betty Gordon, Plaintiffs–Appellants and Cross–Appellees,

v.

Peter BOYLES and Jacor Broadcasting of Colorado, Inc., a Colorado corporation, Defendants–Appellees and Cross–Appellants.

No. 02CA2196.

Colorado Court of Appeals, Div. V.

Feb. 26, 2004.

Certiorari Granted Oct. 18, 2004.

Bruno, Bruno & Colin, P.C., Marc F. Colin, Joseph T. Van Horn, Denver, Colorado, for Plaintiffs–Appellants and Cross–Appellees.

Clisham, Satriana & Biscan, LLC, Daniel R. Satriana, Jr., Denver, Colorado; Hall & Evans, L.L.C., Alan Epstein, Denver, Colorado, for Defendants–Appellees and Cross–Appellants.

Opinion by Chief Judge DAVIDSON.

In this action concerning radio broadcasts of allegedly defamatory statements, plaintiffs, Bryan Gordon (Gordon) and Betty Gordon, appeal from the summary judgment entered in favor of defendants, Peter Boyles and Jacor Broadcasting of Colorado, Inc. Defendants cross-appeal the trial court's order of contempt and imposition of sanctions pursuant to C.R.C.P. 37. We affirm in part,

reverse in part, and remand for further proceedings.

On February 1, 1997, Denver police officer Ron Thomas was stabbed during a fight in the parking lot of Pierre's Supper Club.

From April 10 through 16, 1997, Boyles made statements on his radio talk show on KHOW, a station owned and operated by Jacor, regarding the fight and the alleged participants. According to plaintiffs, Boyles asserted that Gordon, another Denver police officer, was the person who stabbed Thomas and that Gordon had a history of domestic violence and had engaged in an extramarital affair. During the first three broadcasts, Boyles did not mention Gordon by name, but referred to the assailant as a "son of a high-ranking Denver police woman." However, in the later broadcasts Boyles discussed Gordon's background and identified him by name.

In August 1997, based on the content of these broadcasts, plaintiffs brought this action against defendants, alleging seven counts of defamation, as well as claims for intentional infliction of emotional distress (outrageous conduct), false light, respondeat superior, negligent supervision, and loss of consortium. The full text of the alleged defamation is attached to this opinion as an appendix.

A discovery dispute arose over the applicability of the newsperson's privilege to the identity of Boyles's sources, and the trial court entered a contempt sanction against Boyles for refusal to comply with a particular discovery order. Boyles filed an appeal with this court. Subsequently, upon plaintiffs' motion, the trial court ordered Jacor and Boyles's news supervisor to reveal Boyles's sources, and Jacor and the supervisor petitioned the supreme court pursuant to C.A.R. 21 to vacate this order. Because of the similarity of issues presented, the supreme court consolidated Boyles's earlier appeal with that petition, resolved the newsperson's privilege issue, and remanded the case to the trial court for further proceedings. *Gordon v. Boyles*, 9 P.3d 1106 (Colo.2000).

On remand, defendants moved for summary judgment on all plaintiffs' claims, which the trial court granted. Plaintiffs then filed this appeal challenging the dismissal of their claims, except their claim for false light.

Summary judgment is appropriate when the moving party can demonstrate that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Burman v. Richmond Homes Ltd.*, 821 P.2d 913 (Colo.App.1991).

■ We review a summary judgment de novo. *Aspen Wilderness Workshop, Inc. v. Colo. Water Conservation Bd.*, 901 P.2d 1251 (Colo.1995). In determining the existence of an issue of material fact, we assess the evidence in the light most favorable to the nonmoving party. *Seible v. Denver Post Corp.*, 782 P.2d 805 (Colo.App.1989). Because this is a defamation case, in applying this standard, we ensure that First Amendment liberties have been respected by undertaking a full, independent examination of the record, *see DiLeo v. Koltnow*, 200 Colo. 119, 613 P.2d 318 (1980), and by requiring the existence of a material fact to be established with convincing clarity. *See Reddick v. Craig*, 719 P.2d 340, 343 (Colo.App.1985).

I.

Plaintiffs contend the trial court erred in granting summary judgment on their seven defamation claims and concluded as a matter of law that Boyles's statements were not defamatory per se and could not be shown to concern Gordon. We agree in part.

■ Defamation is a communication holding an individual up to contempt or ridicule that causes the individual to incur injury or damage. *Keohane v. Stewart*, 882 P.2d 1293 (Colo.1994).

■ A radio broadcast of defamatory matter is defamation by libel. Restatement (Second) Torts § 568A (1977); *see Matherson v. Marchello*, 100 A.D.2d 233, 473 N.Y.S.2d 998 (N.Y.App.Div.1984); *Holley v. WBNS 10TV, Inc.*, 149 Ohio App.3d 22, 775 N.E.2d 579 (2002).

■ To be defamation per se, that is, to be actionable without proof of special damages, a libelous statement must be (1) on its face and without extrinsic proof, unmistakably

recognized as injurious (defamatory meaning) and (2) specifically directed at the plaintiff (identity). *See Lininger v. Knight,* 123 Colo. 213, 226 P.2d 809 (1951).

### A.

Plaintiffs first argue that Boyles's statements are defamatory per se because they allege criminal activity or serious sexual misconduct. We agree.

■ Whether a statement is defamatory is a question of law. *Walker v. Associated Press,* 160 Colo. 361, 417 P.2d 486 (1966).

■ A publication of libel can be either defamatory per se or defamatory per quod, depending upon the certainty of the defamatory meaning of the publication. If a libelous communication is defamatory per se, damage is presumed, and a plaintiff need not plead special damages. *See Melcher v. Beeler,* 48 Colo. 233, 110 P. 181 (1910); *see also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 112 (5th ed.1984)(in defamation per se, "existence of damage was conclusively presumed or assumed from the publication of the libel itself, without any evidence to show actual harm of any kind"). However, if the statement is defamatory per quod, special damages must be alleged to sustain the claim. *See Bernstein v. Dun & Bradstreet,* 149 Colo. 150, 368 P.2d 780 (1962); Keeton, *supra,* § 112.

■ If defamatory meaning is apparent from the face of the publication, or if the subject matter of the publication falls into one of the traditional slander per se categories, then the publication is defamatory per se. *Bernstein v. Dun & Bradstreet, Inc., supra; see also* W. Prosser, *Libel Per Quod,* 46 Va. L.Rev. 839, 844 (1960).

■ The traditional categories of slander per se are imputation of (1) a criminal offense; (2) a loathsome disease; (3) a matter incompatible with the individual's business, trade, profession, or office; or (4) serious sexual misconduct. Restatement (Second) of Torts § 570; *see Denver Publ'g Co. v. Bueno,* 54 P.3d 893, 899 n. 9 (Colo.2002); *see also Miles v. Nat'l Enquirer, Inc.,* 38 F.Supp.2d 1226, 1229 (D.Colo.1999) (reference to plaintiff as "pedophile" and "sex offender" was defamatory per se because of allegation of serious sexual misconduct).

■ However, if the defamatory meaning may be understood only in reference to extrinsic facts known by the recipient, then the publication is defamatory per quod. *See Bernstein v. Dun & Bradstreet, supra;* Keeton, *supra,* § 112.

■ Here, the four publications concerning the alleged stabbing of Officer Thomas are defamatory per se because each imputes a criminal offense. *See* § 18–3–203(b), C.R.S.2003 (assault in the second degree). The same is true of the two publications alleging domestic violence. *See* § 18–6–800.3, et seq., C.R.S 2003.

Furthermore, although the authorities traditionally have characterized allegations of extramarital affairs as per se defamatory only when they pertained to women, *see, e.g., Biggerstaff v. Zimmerman,* 108 Colo. 194, 114 P.2d 1098 (1941), the Restatement (Second) of Torts includes both genders, as well as conduct other than mere "unchastity." *See* Restatement (Second) of Torts, § 570 cmts. B–C; *see also Rejent v. Liberation Publ'ns, Inc.,* 197 A.D.2d 240, 611 N.Y.S.2d 866, 868–69 (1994) ("Moreover, the notion that while the imputation of sexual immorality to a woman is defamatory *per se,* but is not so with respect to a man, has no place in modern jurisprudence. Such a distinction, having its basis in a gender-based classification, would violate constitutional precepts.").

■ Accordingly, we conclude that a statement that any person is engaging in an extramarital affair is an allegation of serious sexual misconduct for this purpose, and, therefore, the publication here alleging that Gordon engaged in an extramarital affair also is defamatory per se.

### B.

Plaintiffs contend that the trial court erred in concluding that the statements were not specifically directed at Gordon. In making this argument, plaintiffs assert that extrinsic evidence may be used to establish that the

statement is about Gordon without affecting the per se defamatory meaning. We agree.

■ The determination of identity is distinct from the determination of defamatory meaning. Although defamatory meaning must be apparent from the statement itself for a statement to be defamatory per se, whether the statement is directed at the plaintiff can be established by extrinsic proof without rendering the publication defamatory per quod. *See Lininger v. Knight, supra; Switzer v. Anthony,* 71 Colo. 291, 206 P. 391 (1922); *Inter–State Detective Bureau, Inc. v. Denver Post, Inc.,* 29 Colo.App. 313, 484 P.2d 131 (1971).

In *Denver Publishing Co. v. Bueno, supra,* 54 P.3d at 896 n. 3, the supreme court stated that the determination of "libel per se does not include a requirement that the publication be specifically directed at the plaintiff." Plaintiffs urge us to interpret this footnote as eliminating the requirement that to be defamatory per se, the statement must be "of and concerning" the plaintiff. However, we do not read the statement so broadly. Instead, we construe this footnote to be a reaffirmation of *Lininger,* that is, the determination of the identity of the defamed is separate and distinct from the determination of the defamatory character of the statement. While it still must be established that the publication concerned the plaintiff, this determination is not part of an analysis of per se defamatory meaning.

Furthermore, we note that the *Lininger* rule is consistent with the views of numerous commentators. *See, e.g.,* Prosser, More Libel Per Quod, 79 Harv. L.Rev. 1629, 1631 (1966)("Cases in which the defamatory innuendo, or charge, appears on the face of the publication, and it is the reference to the plaintiff, or colloquium, which must be made out by extrinsic facts.—No one disputes that such cases are actionable per se."); Robert D. Sack, *Libel, Slander, and Related Problems,* 101 (1st ed. 1980) ("If extrinsic proof is required to establish that a communication not specifically referring to the plaintiff was reasonably understood by recipients to refer to him, such evidence will be received by the court; it has no effect on whether special damages need be proved.").

We recognize that *Lind v. O'Reilly,* 636 P.2d 1319 (Colo.App.1981), upon which defendants rely, is to the contrary. In *Lind,* a division of this court stated that the need for extrinsic evidence to prove either identity or defamatory meaning rendered the defamation per quod. This statement departs from the rule in *Lininger,* and, in light of *Bueno* and the other authorities, we decline to follow it.

C.

Because we have concluded that extrinsic evidence may be used to determine identity, we consider plaintiffs' proffered extrinsic evidence to determine whether there is a question of fact that the statements concerned Gordon. We conclude that such a question of fact remains which precludes summary judgment on these claims.

■ Although for purposes of determining defamatory meaning, each radio broadcast is a single publication, *see Living Will Ctr. v. NBC Subsidiary (KCNC–TV), Inc.,* 857 P.2d 514 (Colo.App.1993), *rev'd on other grounds,* 879 P.2d 6 (Colo.1994), because extrinsic evidence may be used to determine identity, we analyze all of the broadcasts as a whole to determine whether the statements concerned Gordon. *See Rosner v. Field Enter's, Inc.,* 205 Ill.App.3d 769, 151 Ill.Dec. 154, 564 N.E.2d 131 (1990); *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103 (Tex.2000);

■ Here, there is ample evidence in the record to raise a question of fact concerning all the publications.

The April 10 publication does not mention Gordon by name. However, the publication refers to "the son of a high-ranking Denver police woman." To establish that this statement refers to Gordon, plaintiffs submitted an affidavit of Gordon's partner stating that he understood the statements as referring to Gordon because of their working relationship at the police department. Gordon also stated in his deposition that people would infer that the statements referred to him because "a lot of people know me and a lot of people know my mother." Accordingly, a question of fact

exists as to whether this statement concerned Gordon.

The next publication, made on April 11, also did not mention Gordon by name, but only referred nonspecifically to a "police officer" in reference to the stabbing. However, this statement was made about half an hour before another statement in which the person doing the stabbing was described as the "son of a very high-ranking Denver police woman." Therefore, the jury could reasonably conclude that both statements referred to the same person.

The second publication on April 11 and the publication on April 14 refer only to "the son of a very high-ranking Denver police woman." Based upon the reasoning applicable to the April 10 publication, a question of fact exists for these publications.

All of plaintiffs' defamation claims based on Boyles's final April 16 publications survive summary judgment on the issue of identity as well. Because the first statement on that day mentioned Gordon by name, the second and third statements made later in the same broadcast can be inferred to be about Gordon.

### D.

■ Defendants contend that the statements related to Gordon's history of domestic violence, even if defamatory, were true and therefore are not actionable. We agree.

■ Truth is a complete defense to defamation. However, absolute truth is not required; instead, a defendant need only show substantial truth, that is, "the substance, the gist, the sting of the matter is true." The determination of the truth of an alleged defamatory statement is a question of fact. *Gomba v. McLaughlin,* 180 Colo. 232, 236, 504 P.2d 337, 339 (1972).

Here, the record contains Gordon's arrest record, which indicates that he was arrested for assault and disturbing the peace in February 1991. This document also indicates that these arrests were based upon domestic violence.

To counter this evidence, plaintiffs rely upon Gordon's deposition testimony regarding the arrest. While he originally admitted that he was involved in a "domestic violence situation," he amended his deposition to remove any reference to domestic violence and, instead, described the events as "an incident in February of 1991 which resulted in criminal charges being filed against me."

Nevertheless, regardless of the legal import of the changes to his deposition, Gordon's amended testimony neither suggests an alternative interpretation of the contents of the arrest record nor challenges its authenticity. As a result, in light of this unambiguous documentary evidence, we conclude that no issue of material fact exists in regard to the truth of the statements stating that Gordon had previous "problems" with domestic violence. *See Capitran Inc. v. Great W. Bank,* 872 P.2d 1370, 1376 (Colo.App.1994)(because defendant did not "contest the authenticity or import" of document, in absence of contradictory evidence, summary judgment was appropriate). Accordingly, we conclude that the trial court did not err in granting summary judgment on the fifth and sixth claims.

### II.

Plaintiffs also contend that the trial court erred in granting summary judgment on their claims of negligent supervision and respondeat superior. Again, we agree.

■ A claim for negligent supervision may arise when an employer knew or should have known that an employee's conduct would subject third parties to an unreasonable risk of harm. *Moses v. Diocese of Colo.,* 863 P.2d 310 (Colo.1993).

■ Here, the deposition of the program director of KHOW indicates that she did not know whether Boyles had any training, background, or education in journalism. Additionally, the deposition testimony of the vice president and general manager of Jacor indicated that Jacor had no internal practices or procedures to determine whether its employees were evaluating the credibility of confidential sources. Accordingly, there are sufficient facts in the record to establish a question of material fact as to whether Jacor was negligent in its supervision of Boyles.

Additionally, the evidence regarding Boyles's typical duties and responsibilities at KHOW raises a question of material fact as to whether Boyles's publications were considered within the scope of his employment for purposes of Jacor's liability under a theory of respondeat superior. *See Pediatric Neurosurgery, P.C. v. Russell,* 44 P.3d 1063, 1070 (Colo.2002)("An act of an employee is within the scope of his employment if the work done is assigned to him by his employer, is necessarily incidental to that work, or is customary in the employer's business.").

## III.

Because Betty Gordon's claim for loss of consortium is a derivative claim, the grant of summary judgment against her also must also be reversed.

## IV.

We disagree with plaintiffs, however, that the trial court erred in granting summary judgment on their claim of outrageous conduct.

■ For a plaintiff to recover for outrageous conduct, the defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Rugg v. McCarty,* 173 Colo. 170, 177, 476 P.2d 753–756 (1970)(quoting Restatement (Second) of Torts § 46 cmt. d (1966)); *see also Churchey v. Adolph Coors Co.,* 759 P.2d 1336 (Colo.1988).

Here, we agree with the trial court that, as a matter of law, defendants' conduct was not sufficiently extreme and outrageous to go beyond all bounds of decency in a civilized community.

## V.

On cross-appeal, defendants contend the trial court erred in imposing C.R.C.P. 37 sanctions against Boyles. We disagree.

The trial court ordered sanctions, consisting of a fine and a partial judgment against Boyles on the "actual malice" element of the defamation claims for his "conduct in responding to repeated discovery efforts [which] has caused unwarranted delay, obfuscation and hindrance in Plaintiffs' prosecution of this matter." In its previous ruling regarding the discovery orders, the supreme court did not address these sanctions. Thus, we address them here.

■ We review the trial court's discovery order for an abuse of discretion. We will find an abuse of discretion only if the ruling was manifestly arbitrary, unfair, or unreasonable. *Burt v. Beautiful Savior Lutheran Church,* 809 P.2d 1064, 1069 (Colo.App.1990).

Here, the record reflects that Boyles originally asserted the newsperson's privilege to cover an extremely large body of information. However, as the discovery process continued, Boyles provided supplementary responses to plaintiffs' interrogatories. Those responses revealed additional information apparently available to him at the date of his first response—the number of sources, his reliance upon guests on his show as an additional factual basis, and more details about the information received from these sources—while continuing to assert the newsperson's privilege for other information.

■ From our review of the record, we conclude that the trial court properly determined that there was no legitimate and good faith basis for the assertion of the privilege as to the later revealed information and that this information could have been provided much earlier during the discovery process. Accordingly, we find no abuse of discretion in the court's sanction against Boyles.

Nevertheless, Boyles contends that because the supreme court vacated portions of the sanctions in *Gordon v. Boyles, supra,* these sanctions also must be vacated. However, as discussed, the contempt and subsequent sanctions at issue here were not for the failure to reveal sources, but for Boyles's failure to timely reveal other nonprivileged information. This conclusion was also noted by the supreme court in its earlier decision. *Gordon v. Boyles, supra,* 9 P.3d at 1121 n. 16 ("The trial court imposed sanctions on Boyles under C.R.C.P. 37 that were unrelated to Boyles's refusal to reveal the identity of his news sources.").

The judgment dismissing plaintiffs' claims of defamation based on domestic violence allegations and their claims of outrageous conduct and false light is affirmed, as is the order of contempt and sanctions against Boyles. In all other respects, the judgment is reversed, and the case is remanded to the trial court for further proceedings.

Judge VOGT and Judge DAILEY concur.

### APPENDIX

#### Count 1, April 10, 1997

"Um, there is another story that I have been working on for two days. We cannot get, ah, Chief Michaud or Butch Montoya or for that matter, anyone, to talk with us this morning. It goes back to a place in the city that I think most people know, Pierre's Supper Club. Ah, Pierre's is at 21st and Downing. In an incident involving two Denver police officers, I am told one of them perhaps was the bodyguard of Mayor Webb, the other one is the son of a high ranking Denver police woman, who got into a violent altercation with one another. Ah, they, meaning the police department has said that it, the altercation took place between gang members and police officers, off duty police officers. My sources tell me that was not the case, that it was between the two officers."

"[H]ere's what I was told happened ... by these young people and ah, and they're not, they're not angels. These kids aren't angels ... That they say they're getting blamed for this, that this story that, and by the way, I've been told no reports were filed, that the Denver police officers involved in this covered it up, that it was an assault. One officer stabbed the other, that's what I was told ... and I'm asking you what, and I understand, ah, 'cause I said this earlier, the police, I understand, the police department much like the radios, ah, radio world, nothin' happens that everybody doesn't know about ... I was told that there was drinking, that, that an altercation took place, ah, that one officer stabbed another, that everyone has covered it up, hushed, hushed it."

"In other words, I talked to a couple of people that you and I both know and I, they said yeah, and not only did they say yeah, they said that it was an assault, the assault has been covered up, no one has filed any complaints."

#### Count II, April 11, 1997

"We have another police story about what happened about a month and a half ago in the parking lot of Pierre's Supper Club, Twenty-first and Downing. Eight police officers involved. One stabbed another. A service revolver was lost and they have covered this up."

"Eight police officers, off duty, armed. There was drinking going on and a fight brought out between two of them. I believe one police officer brutally stabbed another. And this has been covered up by the department."

"Remember where you heard this story first. This will become a major story in this city."

#### Count III, April 11, 1997

"I am led to believe that much this, what I'm going to say to you is more than highly probably true. I know for a fact that the police internal, ah, ah, Internal Affairs is investigating this, but it's taking a real long time. You have to ask why. This is what I'm told happened by a number of sources. A fight started between two of the officers. One of them is someone connected to being a bodyguard with the Mayor. The other is the son of a very high ranking Denver police woman. The son of the police woman stabbed the Mayor's bodyguard. Eight police officers were there, off duty with their weapons. A service revolver or a service gun was lost in the scuffle. They never called, after the stabbing took place, they never called 911, they never called in back up, they never called for an ambulance. They blamed it on gang members. They said gang members jumped two of their, jumped these two and stabbed Officer Thomas and got away with the gun. I have been told by my sources, do you really think, Peter, that we could jump eight armed off duty cops, stab one, take one's gun and get away with it. The cover up is amazing. I'm here to tell you this happened."

"My personal belief is one of the police officers stabbed the other. There is an investigation underway by Internal Affairs, but nothing has happened. That's a felony assault beef and we'll talk a lot about that in the time ahead."

"I'm telling you right now, the parking lot of Pierre's Supper Club a month and a half ago, Twenty-first and Downing, where I personally believe through my own work, investigation, if you want to use that as a term, that a police officer stabbed another police officer."

"[T]he people who told me about this incident, John wants to talk to them. They won't talk because they fear retribution. But I'm here to tell you ... this is a story."

"I believe, I personally believe, one officer brutally stabbed another. And, and I believe that in that inner circle of the police officers in the parking lot that night have covered it up."

"You and I have had a private conversation about what I believe happened a month and a half ago in the parking lot of Pierre's Supper Club involving a number of police officers, one stabbing, I believe, another. A service, ah, weapon was lost. It was blamed on some gang kids. I believe it was cop on cop with other cops watching. You have sources that are infinitely better than mine when it comes to what happened in that neighborhood."

### Claim IV, April 14, 1997

"The stabbing of one police officer against the other at Twenty-first and Downing. I have every reason to believe that this actually took place almost two months ago. Off-duty police officers drinking. One of them who was stabbed is on the Mayor's team of bodyguards. The other is the son of a very high ranking Denver police woman. Yeah, I believe it happened. My sources believe it happened. It has been played down and turned into some whole others version of the story."

"And at Twenty-first and Downing the parking lot of Pierre's Supper Club almost two months ago. I personally believe through sources telling the Morning Show on

630 KHOW there was a knife fight between two off duty Denver cops with other off duty Denver cops watching. All had been drinking."

"I believe, 'cause I don't know, I believe, sources tell the Morning Show on 630 KHOW that almost two months ago a number of off duty Denver police officers got into a fight in the Supper Club's parking lot. One was brutally stabbed. Now these are men who now say they got jumped, these two guys got jumped, but they're not looking for a suspect ... [t]here were a number of off-duty police officers drinking in Pierre's."

"An Officer Hall drives Officer Thomas to Denver General Hospital, having been stabbed, I mean ripped across his stomach with a knife. Do you believe? Now I'm telling you man this is a legit story. It's so legit that there was a meeting on Friday of some, some police lieutenants about the Morning Show on 630 KHOW. I'm telling you this happened. My sources tell me its legit."

"Because when the Internal Affairs lieutenant called me on Friday, I said I know the caliber of the gun ... and she said what is it and I said it's a three-eighty and there was silence so I know I'm right."

"Yeah, well, it's more than just scuttlebutt and rumors. I mean, but to imagine that, now, I asked the, the policewoman, she was a lieu-, a policewoman lieutenant. I said, you know, here it is almost two months later and I said well you're still, I said clearly I'm right because you're still looking at this. She said well we look at everything. And I said, come on.

"You know, you gonna tell me that somebody shanks a cop, there's no composite photo in the papers printed to look for the guy who. I mean that's an assault with an intent to kill ... and there's a police officer who clearly was involved in this who's on the job right now."

### Claim V, April 16, 1997

(In response to a guest's assertion that "the person who did the assault ... is Bryan Gordon.")

"Right. And Bryan Gordon, I understand, has some, some problems before. Is that true?"

"Was there any, have you even seen anything about domestic violence when he was in the Academy?"

*Claim VI, April 16, 1997*

"I was told that one of the officers involved when he was in the academy, ah, took a hit on domestic violence and was, his, ah, career in the academy was saved by some political power."

"Well, that, I think that happened prior to the new laws."

"Well, I don't know how to answer that. Because there is that new law that if you have had a domestic violence beef on you they take your gun . . ."

*Claim VII, April 16, 1997*

"I've been told they were drinking. And, and I was told they were drinking considerably."

"So what you're saying to us is, one of the reasons maybe why this was kept quiet is because of what you're saying to us now . . . Yeah, I keep trying to find reasons why this thing was taken south. [Caller: 'Oh, my understanding is that, that it involves a relative of a fairly high ranking officials in the department.'] Well, that's certainly part of it."

"Number two if, if it involves married women, married to other guys, girlfriends of guys and the guys are married, if it involves losing a gun, if people were abusing alcohol, I mean you have all of those things."