2013 COA 100

**Michele FRY, Plaintiff–Appellant,**

**v.**

**Kurtis LEE and The Denver Post, LLC, a Delaware limited liability company doing business in Colorado, Defendants–Appellees.**

**Court of Appeals No. 12CA1575**

Colorado Court of Appeals,
Div. VII.

Announced June 20, 2013

Rehearing Denied July 25, 2013

844

Hopkins Way, PLLC, Edward C. Hopkins, Jr., Denver, Colorado, for Plaintiff–Appellant

Levine, Sullivan, Koch & Schulz, LLP, Thomas B. Kelley, Steven D. Zansberg, Denver, Colorado, for Defendants–Appellees

Opinion by JUDGE LOEB

¶ 1 Plaintiff, Michele Fry, appeals the district court's judgment dismissing her complaint, which alleged defamation and related claims against defendants, Kurtis Lee and The Denver Post, LLC (the Post), pursuant

to C.R.C.P. 12(b)(5). We affirm and remand with directions.

## I. Procedural History and Background

¶ 2 In 2011, Fry ran as a candidate for the District 5 seat on the Denver City Council. As part of her campaign, Fry responded to a questionnaire that the Downtown Denver Partnership (DDP) provided to the District 5 candidates. The candidates' responses were made public.

¶ 3 In March 2011, Lee, a reporter for the Post, contacted Fry by telephone regarding one of her answers on the DDP questionnaire, which appeared to have been copied verbatim from an on-line publication authored by the National League of Cities (NLC). During that phone conversation, Fry denied that she had copied any text without attribution in her responses to the DDP questionnaire. Immediately afterward, Lee sent Fry an e-mail in which he presented, side-by-side, Fry's questionnaire answer and the text from the NLC publication. They were identical.

¶ 4 As relevant here, Fry responded to Lee's e-mail as follows:

Thanks for sending and pointing this out. I now see what you mean and it's my fault. I've read hundreds of pages while preparing to run for city council. I inadvertently used information in a National League of Cities research document while preparing my own position papers.

I would never intentionally lift from another source and should have been more careful.

I regret not having cited the NLC, and for that I apologize. I have called ... one of the authors of the document; I apologized to her directly.... I have now made the appropriate citation in the DDP questionnaire.

¶ 5 That same day, Lee wrote, and the Post published, an article regarding his interaction with Fry. The article's headline stated, "Denver city council candidate caught up in plagiarism charge." The body of the article reported, as pertinent here,

Michele Fry ... plagiarized answers on a candidate questionnaire....

In outlining what she would do to foster economic activity and employment, over half of Fry's response was ripped verbatim from a National League of Cities Economic Development pamphlet....

On a separate question ... Fry's entire response was lifted from the National League of Cities pamphlet.

When first contacted by The Denver Post, Fry denied ever plagiarizing her response to the questionnaire.

"I do research, I'm just now finishing my MBA at Regis Jesuit," said Fry. "I'm not dumb. I would never plagiarize anything."

However, after seeing a side-by-side comparison that showed her responses were not her original work, and did not cite the proper source, she recanted.

"I would never intentionally lift from another source and should have been more careful," said Fry. "I've definitely learned something about research and the scrutiny of political races and will work even harder."

¶ 6 The next day, the Post republished a substantially similar version of the article on its website, with the new headline, "Denver council candidate plagiarized answers on questionnaire." The body of the article was essentially the same as the original article, except for one additional sentence explaining that the DDP had allowed Fry to attribute her answers to the NLC after the Post had pointed out the "discrepancy."

¶ 7 Subsequently, Fry wrote a letter to the Post's editor challenging the accuracy of the articles and claiming that they "grossly misrepresented the situation." The Sunday editor of the Post responded to Fry by letter, articulating the Post's position that the articles accurately reflected what had transpired. The Post refused to publish a correction to the articles.

¶ 8 Fry then filed this action against Lee and the Post. In her First Amended Complaint (amended complaint), she alleged seven claims for relief, including defamation per se, defamation per quod, respondeat superior, negligence, negligence per se, intentional infliction of emotional distress, and deceptive trade practices. All the claims were prem-

ised on the contention that defendants had published materially false and defamatory statements.

¶ 9 In the amended complaint, Fry alleged facts regarding her exchanges with Lee, NLC, and DDP, as well the particulars of the Post's articles. She then alleged that defendants had "knowingly or with reckless disregard for its truth or falsity published the false statement that Ms. Fry had been 'caught up in [a] plagiarism charge,' " as well as "false and misrepresentative statements that misled people to believe that [she] had admitted to intentionally or deceitfully failing to cite the NLC." The thrust of her amended complaint was that the Post's use of the words "plagiarize," "charge," "caught up," and "recant" had falsely communicated that Fry (1) had intentionally copied the NLC text, (2) had been formally charged with the commission of a crime for doing so, and (3) had admitted to intentionally copying the NLC text. She further asserted that the alleged defamatory statements had caused her reputational, economic, and noneconomic damages "similar to what she would have suffered had she actually committed a crime or been arrested, indicted, or convicted."

¶ 10 Fry also alleged that the on-line version of the *Merriam Webster Third New International Dictionary* defined the word "charge" as "a formal assertion of illegality" or "a statement of complaint or hostile criticism," and defined the phrase "caught up" as "to bring about arrest for illicit activities." With respect to the word "plagiarize," she alleged, "At least a substantial and respectable minority of The Post's millions of readers interpret 'plagiarism' as describing an act of intentionally or deceitfully passing off another's writings or ideas as one's own." However, Fry did not refer to any dictionary definition of the word "plagiarize" in the amended complaint.

¶ 11 Fry also attached various exhibits to her amended complaint, including, as relevant here, print-outs of the Post's articles, her e-mail response to Lee's inquiry, and the Sunday editor's letter to her explaining the Post's position that the articles were "factual, unembellished accounts of [Fry's] response to the questionnaire, and [her] acknowledge-

ment that it was copied from previously published work of others without attribution— the definition of plagiarism."

¶ 12 Defendants filed a motion to dismiss Fry's amended complaint pursuant to C.R.C.P. 12(b)(5) on the ground that the challenged statements were substantially true, and thus not actionable, under the heightened standard of review applicable to defamation claims implicating constitutional rights under the First Amendment. Fry timely filed a response to the motion, and defendants filed a joint reply.

¶ 13 In July 2012, the district court issued an order dismissing the amended complaint "in its entirety with prejudice." In its order, the district court acknowledged that "[i]n cases involving freedom of the press, this Court has a special burden of preliminarily testing the validity of the complaint to ensure that the case will not constitute a forbidden intrusion on free speech liberties."

¶ 14 In dismissing Fry's defamation claims, the district court ruled as follows:

Plaintiff disputes the meaning of the words "charged," "plagiarism," and "recant," and claims that the articles would make it appear to the ordinary person that she had been formally "charged" with the "crime" of "plagiarism." It is undisputed that there is no such crime as plagiarism. A reasonable person simply could not come to that conclusion. *See Knapp v. Post Printing & Publ'g Co.,* 111 Colo. 492, 498–99, 144 P.2d 981, 984 (Colo.1943) ("[a] newspaper publication must be measured by its natural and probable effect upon the mind of the average lay reader").

Furthermore, the substance of the articles is true. The dictionary definitions of the challenged words support the Defendants' description of events. "Charge" typically means "accusation." *Webster's Dictionary New Edition* 83. "Plagiarism" means "to present the ideas or words of another as one's own," *Merriam Webster Dictionary* 378 (2005). Furthermore, no reasonable person would understand "plagiarism" to necessarily mean that Plaintiff intentionally stole another's words. "Recant" means to "make an open confession of error."

*Merriam Webster Dictionary New Edition* 414 (2005). It is undisputed that Plaintiff was accused of presenting the words of NLC as her own, and that she later confessed her error. The average lay reader would understand these words to mean exactly that.

¶ 15 The district court further found that the articles were not rendered false simply because they omitted the facts that Fry "called and apologized to the NLC and received [its] blessing to use the quote with citation." It also dismissed Fry's other claims on the ground that they were "all predicated on these articles and on the same facts that give rise to her defamation claims."

¶ 16 This appeal followed.

## II. Standard of Review and Applicable Law

■ ¶ 17 We review a district court's decision to grant a C.R.C.P. 12(b)(5) motion to dismiss de novo and apply the same standards as the district court. *Denver Post Corp. v. Ritter*, 255 P.3d 1083, 1088 (Colo. 2011). Accordingly, we accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Id.* Nonetheless, we are not required to accept as true legal conclusions that are couched as factual allegations. *Id.*

■ ¶ 18 A C.R.C.P. 12(b)(5) motion is looked upon with disfavor, and a complaint should not be dismissed unless it appears beyond a doubt that a claimant can prove no set of facts in support of his or her claim which would entitle him or her to relief. *Pub. Serv. Co. v. Van Wyk*, 27 P.3d 377, 385–86 (Colo.2001). Thus, the purpose of a C.R. C.P. 12(b)(5) motion is to test the formal sufficiency of the plaintiff's complaint. *Wagner v. Grange Ins. Ass'n*, 166 P.3d 304, 306 (Colo.App.2007). C.R.C.P. 12(b)(5) motions should only be granted when "the plaintiff's factual allegations cannot support a claim as a matter of law." *Id.* at 307 (quoting *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 71 (Colo.2004)).

■ ¶ 19 When considering a motion to dismiss for failure to state a claim, we may consider only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference, and matters proper for judicial notice. *Denver Post Corp.*, 255 P.3d at 1088.

■ ¶ 20 A claim for defamation requires, at a minimum, the publication of a false statement of a defamatory nature. *Burns v. McGraw–Hill Broad. Co.*, 659 P.2d 1351, 1360 (Colo.1983). Whether a statement is defamatory is a question of law. *Gordon v. Boyles*, 99 P.3d 75, 79 (Colo.App.2004) (citing *Walker v. Associated Press*, 160 Colo. 361, 417 P.2d 486 (1966)).

■ ¶ 21 Where, as here, a defamation claim involves a public figure or a matter of public concern, it triggers certain constitutional privileges. *Smiley's Too, Inc. v. Denver Post Corp.*, 935 P.2d 39, 41 (Colo.App. 1996). "In such cases, the United States Supreme Court has recognized the competing interest between the protection of reputation and the press'[s] ability to engage in uninhibited, robust, and wide open debate on public issues." *Id.* (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Thus, a heightened burden applies, and the plaintiff is required to prove the publication's falsity by clear and convincing evidence. *Id.* The plaintiff must additionally prove that the defendant published the defamatory statements with actual malice, that is, with actual knowledge that they were false or in reckless disregard of the truth. *New York Times Co.*, 376 U.S. at 279–80, 84 S.Ct. 710; *Diversified Mgmt., Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1109–10 (Colo.1982); *Lewis v. McGraw–Hill Broad. Co.*, 832 P.2d 1118, 1122–23 (Colo.App.1992). Actual malice can be shown if the author entertained serious doubts as to the truth of the statement or acted with a high degree of awareness of its probable falsity. *Barnett v. Denver Publ'g Co.*, 36 P.3d 145, 147 (Colo. App.2001). Whether the evidence in a defamation case is sufficient to support a finding of actual malice is a question of law for the court to decide. *Id.*

■ ¶ 22 Substantial truth is an absolute defense to a defamation claim. *Gomba v. McLaughlin*, 180 Colo. 232, 235, 504 P.2d 337, 338 (1972); *Gordon*, 99 P.3d at 81; *Bar-*

*nett,* 36 P.3d at 147–48; *seeMiles v. Ramsey,* 31 F.Supp.2d 869, 875 (D.Colo.1998) (applying Colorado law). Accordingly, even if a statement is defamatory, it is not actionable if it is substantially true. *Gordon,* 99 P.3d at 81. Furthermore, "[a] defendant asserting truth as a defense in a libel action is not required to justify every word of the alleged defamatory matter; it is sufficient if the substance, the gist, the sting, of the matter is true." *Gomba,* 180 Colo. at 236, 504 P.2d at 339.

¶ 23 In determining whether a challenged statement is substantially true, the inquiry should focus on how an average reader would read the statement. *Miles,* 31 F.Supp.2d at 875–76. The test is whether the challenged statement produces a different effect upon the reader than that which would be produced by the literal truth of the matter. *Id.* (citing *Anderson v. Cramlet,* 789 F.2d 840, 843 (10th Cir.1986) (applying Colorado law)); *Gomba,* 180 Colo. at 236, 504 P.2d at 339.

¶ 24 Finally, because the threat of protracted litigation could have a chilling effect on the constitutionally protected right of free speech, prompt resolution of defamation actions, by summary judgment or motion to dismiss, is appropriate. *Barnett,* 36 P.3d at 147. Such a motion to dismiss for failure to state a claim can be granted on the basis that the challenged publication was substantially true. *Id.* at 147–48.

### III. Analysis

¶ 25 Fry contends that the district court erred when it granted defendants' motion to dismiss because (1) the court misapplied the standard of review for a C.R.C.P. 12(b)(5) motion; (2) reasonable people could have found that the challenged statements were capable of bearing defamatory meaning and were materially false; and (3) the court improperly summarily dismissed Fry's ancillary claims based on the failure of her defamation claims.

¶ 26 We disagree for the reasons discussed below.

### A. Application of the C.R.C.P. 12(b)(5) Standard of Review

¶ 27 Fry contends that, in ruling on the C.R.C.P. 12(b)(5) motion, the district court erred because it did not accept her pleaded facts as true and construe them in the light most favorable to her, as required under the applicable standard of review. Specifically, she contends that the district court erred when it improperly considered facts and documentary materials provided by defendants and when it consulted and relied on dictionary definitions regarding the meaning of the words "charge," "plagiarism," and "recant."

¶ 28 We perceive no error in the district court's application of the C.R.C.P. 12(b)(5) standard of review. Nowhere in its order did the district court make reference to or rely on any documentary materials attached to defendants' motion to dismiss other than documents referenced in or attached to the amended complaint itself. Rather, the district court cited the proper legal standard for its review, noting that it "may consider only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which the court may take judicial notice." *See Denver Post Corp.,* 255 P.3d at 1088. The order then proceeded to accept as true all of the factual allegations Fry made regarding the events that had transpired.

¶ 29 Fry argues that the district court erred by relying on standard dictionary definitions and was required, instead, to accept as true the definitions that she purported to aver as facts in her amended complaint. We are not persuaded. In ruling on a C.R.C.P. 12(b)(5) motion to dismiss, the meaning of allegedly defamatory words is a matter of law left to the court—not a factual allegation to which it must defer. *See Knapp,* 111 Colo. at 498, 144 P.2d at 984 (whether words, "when construed according to their natural and ordinary meaning, are defamatory on their face . . . is a question of law for the court") (quoting *Rocky Mountain News Printing Co. v. Fridborn,* 46 Colo. 440, 448, 104 P. 956, 959 (1909)). Accordingly, under the applicable standard of review, the district court was not required to accept

Fry's averments regarding the defamatory meanings of the words "plagiarize," "charge," and "recant" as fact. *See Denver Post Corp.,* 255 P.3d at 1088 (reviewing court is not required to accept as true legal conclusions that are couched as factual allegations).

¶ 30 Rather, in making its determination, the district court properly relied on the plain and ordinary meanings of the allegedly defamatory words. *See Anderson,* 789 F.2d at 844 (applying Colorado law) (the meaning of an allegedly defamatory statement is determined by the plain and ordinary meaning of the word); *Knapp,* 111 Colo. at 498–99, 144 P.2d at 984 (same). To determine the plain and ordinary meanings of words in the context of defamation claims, Colorado courts commonly and properly rely on lay dictionary definitions. *See NBC Subsidiary (KCNC-TV), Inc. v. Living Will Center,* 879 P.2d 6, 13 (Colo.1994) (relying on *Webster's Dictionary* to define a challenged word in a defamation action); *Knapp,* 111 Colo. at 500, 144 P.2d at 985 (relying on dictionary to define challenged word in affirming judgment dismissing libel claim for failure to state a claim); *see also Anderson,* 789 F.2d at 844 (relying on *Webster's Dictionary* in a defamation claim to determine the "common usage" of the word "kidnapping").[1]

¶ 31 Therefore, contrary to Fry's contention, the district court was not required to accept the meanings alleged in her amended complaint as factual matters; instead, it properly referred to lay dictionaries to determine, as a matter of law, the ordinary and plain meanings ascribed to the challenged words.

### B. Defamatory Meaning and Substantial Truth

¶ 32 Fry next contends that the district court erred because, if all her factual averments are taken as true and construed in the light most favorable to her, the amended complaint adequately stated a claim that the challenged words and phrases were defamatory and materially false, and furthermore, that defendants intended this effect. We disagree.

¶ 33 The district court concluded that "all of Fry's defamation claims must be dismissed" on two grounds: (1) that the words "charged," "plagiarism," and "recant" would not be interpreted by a reasonable person to have the defamatory meanings Fry alleged in her amended complaint and (2) that "the substance of the articles is true." The district court's analysis of the meaning of the challenged words is necessarily intertwined with its analysis of the substantial truth of the published statements. *See Bustos v. A & E Television Networks,* 646 F.3d 762, 766 (10th Cir.2011) ("[t]o be sure, the questions whether a statement is *defamatory* and whether it contains a *material falsehood* sometimes overlap") (emphasis in original). We perceive no error in the trial court's ruling with regard to the meaning of the challenged words or the substantial truth of the articles.

### i. Meaning of the Challenged Words

¶ 34 We first consider whether the trial court erred in the meanings it ascribed to the challenged words and phrases. With respect to Fry's contention that the court was required to accept as true the definitions she provided in her amended complaint, as already noted, we are not persuaded. *See Knapp,* 111 Colo. at 498, 144 P.2d at 984 (whether words, "when construed according to their natural and ordinary meaning, are defamatory on their face … is a question of law for the court") (quoting *Rocky Mountain News,* 46 Colo. at 448, 104 P. at 959). Regardless of Fry's allegations, in considering a defamation claim, a court must determine how the publication would have been understood by a reasonable or average lay reader.

1. Courts also typically rely on lay dictionaries to determine the ordinary meaning of challenged words in many other legal contexts as well. *See Hecla Mining Co. v. N.H. Ins. Co.,* 811 P.2d 1083, 1091 (Colo.1991) ("[w]hen determining the plain and ordinary meaning of words, definitions in a recognized dictionary may be considered" in contract interpretation); *People v. Forgey,* 770 P.2d 781, 783 (Colo.1989) (when construing statutory terms, "[w]e have frequently looked to the dictionary for assistance in determining the plain and ordinary meaning of words"); *Nicholls v. Barrick,* 27 Colo. 432, 443, 62 P. 202, 206 (1900) (relying on the *Standard Dictionary* to determine meaning of disputed term in election law case).

*See Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 513, 515, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (evaluating the publication by its impact on a "reasonable reader"); *Knapp,* 111 Colo. at 498–99, 144 P.2d at 984 ("[a] newspaper publication must be measured by its natural and probable effect upon the mind of the average lay reader"). When determining how a reasonable or average lay reader would have perceived the statements, the district court properly, as a matter of law, referred not only to a lay dictionary, but also to the articles and the amended complaint as whole. *See Knapp,* 111 Colo. at 500, 144 P.2d at 985 (in determining whether a word is defamatory the court "cannot travel into the realm of conjecture, but must confine [itself] to the natural, ordinary, and commonly-accepted meaning of the words themselves, considered in connection with the other facts alleged in the complaint").

¶ 35 With regard to the use of the word "plagiarism," the district court found that, according to the *Merriam Webster Dictionary,* "plagiarism" means "to present the ideas or words of another as one's own," without any reference to intent. *Merriam Webster Dictionary* 378 (2005).[2] In contrast, Fry alleged in her amended complaint that a substantial portion of the Post's readers would have necessarily read "plagiarism" to mean that she had *intentionally* presented the NLC text as her own. However, she provided no authority for that definition.

¶ 36 The parties have not cited, and we have not found, any Colorado appellate cases defining the word "plagiarize." However, other courts have indicated, consistently with the standard dictionary definitions, that plagiarism does not necessarily or even typically entail the concept of intent. For example, the United States Supreme Court has defined plagiarism as "the use of otherwise unprotected works and inventions without attribution," without any reference to intent. *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, 36, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003).

¶ 37 Similarly, other courts have defined plagiarism, as used in the academic context, as did the district court here. *See Newman v. Burgin,* 930 F.2d 955, 962 (1st Cir.1991) ("plagiarize" reasonably means to give the impression that one has written or thought something that was in fact borrowed from another, without reference to intent); *Chandamuri v. Georgetown Univ.,* 274 F.Supp.2d 71, 79 (D.D.C.2003) (granting a motion to dismiss for failure to state a claim and finding academic definition of plagiarism does not require intent); *see also* Stuart P. Green, *Plagiarism, Norms, and the Limits of Theft Law,* 54 Hastings L.J. 167, 181 n.52 (2002) (noting that the American Historical Association's "influential" "Statement on Plagiarism" and many university honor codes do not define plagiarism as requiring intent, and opining that the majority of institutional honor codes prohibit unattributed copying without regard to intent).

¶ 38 Both articles published by the Post explicitly quoted Fry's statement that she did not intentionally copy the NLC text, and nothing in those articles expressly or inferentially suggested anything to the contrary. *See Burns,* 659 P.2d at 1360 ("the entire published statement must be examined in context, not just the objectionable word or phrase"). Accordingly, we perceive no error in the district court's conclusion that "no reasonable person would understand 'plagiarism' to necessarily mean that [Fry] intentionally stole another's words."

¶ 39 Next, we consider the phrase, "caught up in plagiarism charge." Fry alleged in her amended complaint that "almost all people interpret the use of the verb phrase 'caught up' and the noun 'charge' in the same clause to impute the commission of a crime." Again, given that it is a matter of law for the court to decide whether a phrase has defamatory meaning, the district court was not required to accept her allegation as fact. *See Denver Post Corp.,* 255 P.3d at

---

**2.** In its order, the district court referred to the 2005 edition of the *Merriam Webster Dictionary.* We note that the print version of *Webster's Third New International Dictionary* 1728 (2002) similarly includes two definitions of the word "plag-

iarize" that do not include intent as part of the definition—(a) to "use a created production without crediting the source"; and (b) to "present as new and original an idea or product derived from an existing source."

1088.. The district court referenced a standard dictionary definition to determine that the word "charge" typically means "accusation." *Merriam Webster Dictionary* 83.[3] Based on this definition, and because Fry concedes that plagiarism is not a crime in Colorado, we discern no error in the district court's conclusion that the use of the word "charge" could not have been construed by a reasonable or average lay reader to imply Fry was the subject of a criminal charge.

¶ 40 The district court's conclusion is further supported by the articles as a whole, which make no mention whatsoever of any criminal charge or law enforcement entities. Rather, the articles use the word "charge" squarely in the context of an accusation made against Fry by the Post. Indeed, Fry concedes in her amended complaint that a reader would not infer that the challenged phrase implied criminal charges "if the context of the publication makes it clear that a different meaning was intended." In our view, the published articles did just that.

¶ 41 Case law also supports the definition of "charge" relied on by the district court. For example, United States Supreme Court defamation and libel cases consistently use the word "charge" in reference to noncriminal accusations made by the press. *See Herbert v. Lando*, 441 U.S. 153, 163 n.10, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) ("every publication, either by writing, printing, or pictures, which *charges* upon or imputes to any person that which renders him liable to punishment, or which is calculated to make him infamous, or odious, or ridiculous, is *prima facie* a libel") (emphasis added) (quoting *White v. Nicholls*, 44 U.S. (3 How.) 266, 290–91, 11 L.Ed. 591 (1845)); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 326–27, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ("There was also no basis for the *charge* that petitioner was a 'leninist' or a 'Communist-fronter.' . . . The managing editor of American Opinion made no effort to verify or substantiate the *charges* . . . . ") (emphasis added); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 169 n.6, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) ("President Roosevelt

. . . used the term muckrake in attacking the practice of making sweeping and unjust *charges* of corruption against public men") (emphasis added) (quoting *Webster's New International Dictionary* 1606); *New York Times Co.*, 376 U.S. at 256, 258 n.2, 273 n. 14, 288–89 (allegedly defamatory article "went on to *charge* " that civil rights activists were "being met by an unprecedented wave of terror"; "[a] number of the allegedly libelous statements—the *charges* that the dining hall was padlocked and that Dr. King's home was bombed, his person assaulted, and a perjury prosecution instituted against him—did not even concern the police"; "[r]espondent did not consider the *charge* of expelling the students to be applicable to him"; public officials operate in a climate where "[ c ] *harges* of gross incompetence, disregard of the public interest, communist sympathies, and the like usually have filled the air") (emphasis added); *Garrison v. Louisiana*, 379 U.S. 64, 65–66, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ("[t]he principal *charges* alleged to be defamatory were his attribution of a large backlog of pending criminal cases to the inefficiency, laziness, and excessive vacations of the judges") (emphasis added).

¶ 42 Colorado cases have also used the word "charge" in the same manner—as referring to noncriminal accusations made by the press. *See Diversified Mgmt., Inc.*, 653 P.2d at 1112 ("[T]he public official or public figure stands on an entirely different level than the involuntary news figure. . . . The private citizen has no opportunity to rebut the false *charges* in any effective way.") (emphasis added) (quoting *Walker v. Colo. Springs Sun, Inc.*, 188 Colo. 86, 111, 538 P.2d 450, 465 (1975), *overruled by Diversified Mgmt.*, 653 P.2d 1103); *Burns*, 659 P.2d at 1360 ("[i]n this context, reasonable people could have believed that the reporter had inside knowledge of the facts which would support her *charge* that Mrs. Burns 'deserted' Jack Burns") (emphasis added).

¶ 43 Fry's reference in her briefs on appeal to the definition of "charge" found in *Black's Law Dictionary* does not persuade

---

**3.** The print edition of *Webster's Third New International Dictionary* similarly defines "charge," in this context, as "an accusation of a wrong or offense"; or as "a statement of complaint or hostile criticism." *Webster's Third New International Dictionary* 377.

us otherwise. "[T]he meaning of an allegedly defamatory statement is not determined by legal research, but 'by the plain and ordinary meaning of the word.'" *Anderson*, 789 F.2d at 844 (quoting *Simonson v. United Press Int'l, Inc.*, 654 F.2d 478, 482 (7th Cir. 1981)). Regardless, even if some readers in the legal field might have interpreted the word to mean a criminal charge, courts have held that technical errors in legal terminology are of no legal consequence in defamation actions involving the press. *See Barnett*, 36 P.3d at 148 (defamation claim properly dismissed where the press reported public figure was involved in "stalking incident" though he was convicted only of misdemeanor harassment, and stalking was legally considered a felony).

¶ 44 Nor are we persuaded by Fry's argument that defendants' use of the words "caught up" in the first article's headline implied criminal conduct by Fry. In the amended complaint, Fry relied on the online version of the *Merriam Webster Third New International Dictionary* as defining "caught up" to mean "to bring about arrest for illicit activities." However, that source defines the phrase "caught up" as the past tense of the phrase "catch up." *Merriam Webster Dictionary*, http://www. merriam-webster.com/dictionary/caughtüup. Further, the definition proffered by Fry is listed as only the fourth possible definition for the phrase, including, as relevant here, "1 *b* : ensnare, entangle <education has been *caught up* in a stultifying mythology ..." *Id.* Not only is Fry's proffered definition listed as a less common usage of the phrase, the explanatory sentence provided by the online dictionary in connection with that definition ("the police *caught up* with the thieves") does not even correspond with defendants' use of the phrase in the article's headline.

¶ 45 Accordingly, we perceive no error in the district court's conclusion that an average reader would not have inferred that Fry had been the subject of a formal criminal charge, but rather that she had been accused by defendants simply of copying the NLC's text without attribution.

¶ 46 We also reject Fry's arguments regarding defendants' use of the word "re-

cant." Fry alleges in her amended complaint that the word "recant" implies that she admitted to intentionally presenting the copied text as her own. The district court concluded that, according to a standard dictionary definition, "recant" means to "make an open confession of error." *Merriam Webster Dictionary* 414. Viewing the articles as a whole, and the use of the word "recanted" in context, we perceive no error in the district court's conclusion that an average lay reader would have understood defendants' use of "recant" to be consistent with this dictionary definition. Indeed, the articles made it abundantly clear that Fry's position was that her plagiarism was unintentional. The clear import of the articles was that Fry recanted her original erroneous statement to Lee that she did not copy the NLC's text. *See Knapp*, 111 Colo. at 500, 144 P.2d at 985 (to determine if challenged words are defamatory court must rely on natural, ordinary and commonly-accepted meaning of the words, considered in connection with other alleged facts in complaint).

¶ 47 To the extent that Fry challenges the phrase "ripped verbatim" for the first time in her reply brief on appeal, we decline to address her argument, because it was not raised either in the district court or in her opening brief on appeal. *See Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.*, 2012 CO 61, ¶18, 287 P.3d 842 ("[i]t is axiomatic that issues not raised in or decided by a lower court will not be addressed for the first time on appeal"); *Holley v. Huang*, 284 P.3d 81, 87 (Colo.App.2011) (appellate court will not address arguments that appear for the first time in a reply brief).

¶ 48 In sum, we perceive no error in the district court's overall conclusion that a reasonable or average lay reader would not have read the challenged statements with the defamatory meanings ascribed to them by Fry. *See Knapp*, 111 Colo. at 498–500, 144 P.2d at 984–85 (challenged statements regarding candidate for public office, when considered in light of ordinary meaning and the other facts alleged in the complaint, were not actionable because they were not defamatory on their face or capable of the defamatory

meaning which the plaintiff ascribed to them).

## 2. Substantial Truth

¶ 49 We next consider the district court's second ground for dismissing. Fry's amended complaint—that the articles were substantially true. Again, we perceive no error and agree with the district court's conclusion that Fry's defamation claims are not actionable under the doctrine of substantial truth. *Gomba*, 180 Colo. at 235, 504 P.2d at 338 (substantial truth is an absolute defense to a defamation claim); *Gordon*, 99 P.3d at 81 (same); *Barnett*, 36 P.3d at 147–48 (same).

¶ 50 To be actionable, an allegedly defamatory statement must contain a material falsehood. *See Bustos*, 646 F.3d at 764; *see also Burns*, 659 P.2d at 1360. To qualify as a material falsehood, the challenged statement must be false and "likely to cause reasonable people to think 'significantly less favorably' about the plaintiff" than if they knew the whole truth. *Bustos*, 646 F.3d at 765.

¶ 51 The district court held that "the substance of the articles [was] true" because defendants' description of the events was consistent with the plain and ordinary meanings of the challenged words "plagiarism," "charge," and "recant." The district court observed:

> It is undisputed that Plaintiff was accused of presenting the words of the NLC as her own, and that she later confessed her error. The average lay reader would understand these words to mean exactly that.

¶ 52 The district court further concluded that the impact of certain omitted facts did not require a different conclusion:

> Plaintiff argues that the articles should have included the fact that she called and apologized to the NLC and received [its] blessing to use the quote with citation. The Court finds that these additional facts would not have changed the tenor of the articles.

¶ 53 We perceive no error in the district court's reasoning. The plain and ordinary meaning of the articles truthfully and accurately reflected the undisputed facts that (1) Fry copied significant portions of NLC text without attribution; (2) when questioned by Lee, she initially denied having done so; and (3) when confronted with the identical text, she then admitted she was in error and had indeed copied the text.

¶ 54 We agree with the district court that any version of the pertinent events that would have included the omitted facts referenced by Fry simply fails to produce a different effect than the version that was published. *See TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1197 (10th Cir.2007) (applying Colorado law) ("the omission of what the plaintiff considered to be relevant information would not convert an otherwise nonactionable statement into a defamatory one") (citing *NBC Subsidiary*, 879 P.2d at 15).

¶ 55 While including the omitted facts of Fry's apology to NLC and its response to her might have provided a more well-rounded picture of Fry's actions *after* it was already established that she had copied the NLC's text without attribution, these facts would not have changed the overall truthful gist of the article that she had indeed copied significant portions of NLC text without attribution; denied that she had done so; and then, once confronted, changed her position and admitted that she had made a mistake. *See also Masson*, 501 U.S. at 517, 111 S.Ct. 2419 (alleged defamatory statement is not considered false unless it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced") (quoting R. Sack, *Libel, Slander, and Related Problems* 138 (1980)); *Gomba*, 180 Colo. at 236, 504 P.2d at 339. Accordingly, we conclude that none of the omitted facts created any material falsity by their omission. *See Bustos*, 646 F.3d at 764 (a material falsehood causes reasonable people to think "significantly less favorably about the plaintiff" than if they knew the whole truth). As courts have noted:

> Every news story ... reflects choices of what to leave out, as well as what to include.... Courts must be slow to intrude into the area of editorial judgment not only with respect to choices of words, but also with respect to inclusions in or

omissions from news stories. Accounts of past events are always selective, and under the First Amendment the decision of what to select must almost always be left to writers and editors. It is not the business of government.

*NBC Subsidiary,* 879 P.2d at 15 (quoting *Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1306 (8th Cir.1986)).

¶ 56 Fry's assertion that at least some portion of the Post's extensive readership was likely to have interpreted the articles in the defamatory manner she alleges is simply immaterial to the appropriate legal analysis here.[4] As a matter of law, even if some readers understood the published statements as defamatory, they are not actionable where the plain and ordinary meaning of the articles is substantially true. *See Gordon,* 99 P.3d at 81; *Barnett,* 36 P.3d at 147.

¶ 57 Furthermore, the articles concerned Fry's candidacy for public office. A candidate for public office

invites consideration of his qualifications, and tenders, as an issue to be tried out publicly before the people, his honesty, integrity, and fitness for the office to be filled.... It is one of the hazards which a candidate for public favor must face that he is exposed to critical, and perhaps unjust, comments, but these, unless they transcend the bounds of what the law permits, must be borne for the sake of maintaining a free press.

*Knapp,* 111 Colo. at 500–01, 144 P.2d at 985. Accordingly, we are not persuaded by Fry's argument that she is entitled to relief solely because of the possibility that some minority of readers might have interpreted the articles as disparaging. *See New York Times Co.,* 376 U.S. at 279–80, 84 S.Ct. 710 (in defamation cases involving public figure, plaintiff must prove defendant acted with actual knowledge that the statements were false or in reckless disregard of the truth); *Diversified Mgmt., Inc.,* 653 P.2d at 1109–10 (same). While Fry made a conclusory allegation in her amended complaint that defendants acted with actual malice, in our view she made no factual allegations to support this conclusion of law, and accordingly, we disregard it. *See Denver Post Corp.,* 255 P.3d at 1088 (we are not required to accept as true legal conclusions that are couched as factual allegations).

¶ 58 In sum, we perceive no error in the district court's judgment dismissing Fry's defamation claims on the bases that the challenged statements were not subject to interpretation by a reasonable reader as being defamatory as she alleges, and that they were substantially true. *See Barnett,* 36 P.3d at 147 (favoring the prompt resolution of defamation actions by motion to dismiss to avoid a chilling effect upon constitutionally protected rights of free speech).

### C. Ancillary Claims

¶ 59 Finally, Fry contends that the district court also erred when it dismissed her other claims for relief. Fry's ancillary claims included respondeat superior, negligence, negligence per se, intentional infliction of emotional distress, and deceptive trade practices.

¶ 60 The district court dismissed these claims as follows:

Plaintiff's other claims must be dismissed as well. They are all predicated on these articles and on the same facts that give rise to her defamation claims. Alternative torts cannot be used to evade the constitutional requirements for defamation actions.

¶ 61 We perceive no error. Courts have employed similar reasoning to dismiss a variety of ancillary claims in defamation and libel cases. *See Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 99

---

4. In her reply brief, Fry purports to quote from reader comments on the Denver Post website to show that three readers did indeed interpret the articles as defamatory. She argues that these comments were properly before the district court because they were available at a website address printed on a copy of the challenged article that was attached to her amended complaint. We are not persuaded that these comments were thereby properly before the district court and note that this is not the type of information of which a court can properly take judicial notice. *See Castillo v. Koppes–Conway,* 148 P.3d 289, 291 (Colo. App.2006) (parties must make all arguments accessible to judges "rather than ask them to play archaeologist with the record") (quoting *DeSilva v. DeLeonardi,* 181 F.3d 865, 867 (7th Cir.1999)).

L.Ed.2d 41 (1988) ("public figures ... may not recover for the tort of intentional infliction of emotional distress by reason of publications ... without showing in addition that the publication contains a false statement of fact which was made with 'actual malice'"); *Jefferson Cnty. Sch. Dist. No. R–1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 857–58 (10th Cir.1999) (affirming dismissal of intentional interference with contract and business relations claims based on failure to establish related defamation claim); *Miles*, 31 F.Supp.2d at 880 (dismissing the plaintiff's ancillary tort claims related to failed defamation claim); *Buckhannon v. U.S. W. Communications, Inc.*, 928 P.2d 1331, 1334–35 (Colo. App.1996) (affirming dismissal of claims for tortious interference that were based on allegedly defamatory statements because the court found the statements were privileged and therefore not actionable); *Lewis*, 832 P.2d at 1124 (affirming summary judgment dismissing negligence and infliction of emotional distress claims based on defamation claim's failure to show actual malice); *Brooks v. Paige*, 773 P.2d 1098, 1101–02 (Colo.App. 1988) (adopting reasoning in *Hustler Magazine, Inc. v. Falwell*).

¶ 62 Accordingly, we conclude the district court did not err in dismissing Fry's ancillary claims, given that they allege damages resulting from defendants' purportedly defamatory statements. Absent a legally sufficient pleading of material falsity, recovery is barred by the First Amendment. *See Williams v. Cont'l Airlines, Inc.*, 943 P.2d 10, 16 (Colo.App.1996) ("plaintiffs may not avoid the strictures of defamation law by artfully pleading their defamation claims to sound in other areas of tort law") (quoting *Vackar v. Package Mach. Co.*, 841 F.Supp. 310, 315 (N.D.Cal.1993)); *Lewis*, 832 P.2d at 1124–25 (First Amendment limitations on defamation claims "apply equally to ancillary tort claims which might arise from the publication of an allegedly defamatory statement").

### IV. Attorney Fees

¶ 63 Defendants request an award of attorney fees on appeal pursuant to section 13–

17–201, C.R.S. 2012. Because the district court properly dismissed Fry's claim under C.R.C.P. 12(b)(5), we grant defendants' request for attorney fees on appeal. *See Walker v. Van Laningham*, 148 P.3d 391, 398 (Colo.App.2006).

¶ 64 We exercise our discretion under C.A.R. 39.5 and remand to the district court for a determination of the amount of reasonable attorney fees to be awarded to defendants for this appeal. *Id.*

¶ 65 The judgment is affirmed, and the case is remanded for further proceedings consistent with this opinion.

JUDGE TERRY and JUDGE NEY * concur.