24CA1275 Datko v Dunn 07-03-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1275
Jefferson County District Court No. 23CV31339
Honorable Ryan P. Loewer, Judge

Lindsay Datko and Jefferson County Students First d/b/a Jeffco Kids First,

Plaintiffs-Appellees,

v.

Rylee Dunn and Colorado News Conservancy, PBC d/b/a Arvada Press,

Defendants-Appellants.

ORDER REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE MEIRINK
Freyre and Gomez, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 3, 2025

Gessler Blue LLC, Scott E. Gessler, Geoffrey N. Blue, Greenwood Village,
Colorado, for Plaintiffs-Appellees

Zansberg Beylkin LLC, Steven D. Zansberg, Michael Beylkin, Denver, Colorado,
for Defendants-Appellants

¶ 1     In this anti-SLAPP[1] case, the defendants, Rylee Dunn and Colorado News Conservancy, PBC (CNC), appeal the district court's order denying their amended special motion to dismiss the plaintiffs' claims of libel per se and libel per quod. We conclude that the district court erred by not granting the amended special motion. Accordingly, we reverse and remand to the district court with instructions.

## I. Background

### A. Factual Background

¶ 2     Plaintiff Lindsay Datko is the executive director of plaintiff Jefferson County Students First, d/b/a Jeffco Kids First (JKF), an unincorporated nonprofit organization engaged in education advocacy. JKF operates a Facebook page that has approximately 6,000 members. JKF's Facebook page is an open forum for commentary and provides an avenue for members to exchange ideas and information.

¶ 3     In March 2022, members of the JKF Facebook group discussed students attending Jefferson County Public Schools

---

[1] "SLAPP" is an acronym for "strategic lawsuits against public participation."

dressed as "furries," which the parties define in their court pleadings as "a child dressing as an animal, such as a cat or a dog." As part of the discussion, one JKF Facebook group member posted a photo of a student dressed in a furry costume. In response to the photo, another member posted the following:

> Kids are called out all the time for dress code violations at my kids [sic] school such as wearing hats, shorts too short, etc. However this is acceptable and part of EVERY day at our school. It's allowed and there are numerous kids doing this. I don't understand how it's not a distraction. This is an actual photo of a kid in my kids [sic] class. It really bothers my kids. Honest thoughts please. Thank you.[2]

The post received 283 comments. In response to the discussion, Datko emailed Jefferson County school officials to "express concern about the distractions, safety, and disruptive animal-like behaviors" and to learn about district policies that might be implicated by such conduct.

¶ 4    In August 2022, Drake Middle School — a Jefferson County Public School — announced that it would no longer allow costume-

---

2 Datko asked the person who posted the photo to "crop th[e] picture up to just the head" to ensure the student could not be identified.

like attire, such as tails, headbands, face paint, or capes, that distracted from learning.  Datko advocated for the entire school district to adopt Drake Middle School's policy and posted the following on JKF's Facebook page: "If just 100 of you email the list below (see top of comments) and ask them to ban ear/tails/furries as a district-wide policy, we might see this happen.  Email your schools as well if this is an issue for you.  See policy in comments as well."

¶ 5    In September 2022, Republican gubernatorial candidate Heidi Ganahl learned that students in Jefferson County schools were dressing up as furries and raised the issue in an interview with a Denver-area radio station, stating, "Not many people know that we have furries in Colorado schools . . . it's happening all over Colorado and the schools are tolerating it.  It's insane."  Ganahl's statements were covered by various media outlets, including by Denver's Channel 9 News, which used the March 2022 photo that had been posted on JKF's Facebook page in its broadcast.  Members of the media started reaching out to Datko and JKF, asking them for "any evidence you can provide to support" claims that children in

Colorado were dressing as furries. In response, Datko posted the following on JKF's Facebook page:

> The media is really trying to spin this. If any of your kids would be willing to record anonymous audio of their experiences with furries hissing, barking, clawing, chasing, and how it affects their school day, please send to me or let me know ASAP.

The post elicited many comments.

¶ 6 Dunn is a news reporter for CNC, which operates the Arvada Press. Dunn first learned of JKF in June 2022. In early October 2022, Dunn heard that members of JKF were discussing the presence of furries in Jefferson County schools. Dunn proposed to her editors that she "prepare a news report on the [JKF] group and its involvement in bringing the issue of 'furries in the schools' to the fore in the gubernatorial campaign." Dunn's editors approved, and she began investigating JKF. Dunn gained access to JKF's Facebook page and discovered Datko's September 2022 Facebook post and responses to the post, one of which told members that they could find evidence of students dressed as furries in Jefferson County schools by searching the same on TikTok's social media app. In the comments to one of the TikTok videos, a user used the

4

hashtag "#KillFurrys" in response to a video of a student dressed as a furry.

¶ 7    Dunn's article, "Inside Jeffco Kids First, and Ganahl's furor over students," was published online on the Arvada Press's website on October 7, 2022. In her article, Dunn wrote that "[a] leading voice in the group told parents to empower their children to find 'furries,' kids who dress up in animal accessories, and to record them," and that "[l]ast month, Datko urged the nearly 6,000 members of [JKF] to have their kids secretly record their classmates." She also wrote that "[n]either Datko nor Ganahl responded to Colorado Community Media's requests for interviews about the Facebook group's activities." The article went on to say the following:

> A member of the group posted an additional suggestion: "go on tiktok and use the keyword furries and Colorado school."
>
> A Community Media search of TikTok found numerous posts where purported students in the state recorded videos of classmates, who seemed unaware they were being filmed dressed in costumes and accessories. Some posts contained threats against the students being filmed.

5

> One post of a student apparently filmed without their knowledge contained the hashtag "#killfurrys." Other posts harshly mocked the students.

On the last page of the article, Dunn included Datko's September 2022 Facebook post with the caption, "[s]creenshot of Datko's post in [JKF] asking parents to have their children record classmates." Beside it, Dunn included a second screenshot of the above-mentioned TikTok video recording students identified as furries in a school.

¶ 8 The same evening the article was published online, Datko contacted the paper's editor-in-chief, requesting that Dunn's article retract the following statement: "Last month, Datko urged the nearly 6,000 members of [JKF] to have their kids secretly record their classmates." Datko proposed that Dunn's statement should "read something like: Last month, Datko requested anonymous verbal statements from children belonging to the 6,000 members in the group." Dunn conferred with her editors, and they decided not to retract the statement. Instead, they published the following editor's note to accompany the article:

> Lindsay Datko contacted Colorado Community Media after online publication of this story to

seek a retraction, stating that she sought "anonymous verbal statements from children." Datko disagreed with the article's sentence, "Datko urged the nearly 6,000 members of Jeffco Kids First to have their kids secretly record their classmates." Screenshots from the group show she made that request. Datko confirmed to Colorado Community Media that she received pictures of students but indicated to the group that she has not used them.

CNC published Dunn's article in twenty-three other news outlets.

¶ 9 Based on Datko's September 2022 Facebook post and after listening to Datko speak on a local radio station about JKF and its activities, Thelma Grimes, an editor at Colorado Community Media (CCM), wrote an opinion column titled "Distracted Distractions," which was published on October 13, 2022, in CCM's papers, including the *Littleton Independent*. In preparing the opinion column, Grimes relied on Dunn's article, other press reports, Datko's Facebook post, and discussions with CCM reporters. In her opinion column, Grimes stated that Datko "encouraged people to take pictures of children who behave or dress differently" and that "[k]ids can be mean enough without some parent group encouraging them to take pictures and post them on social media."

7

¶ 10    According to Datko, both she and JKF were harmed by the publications and have "suffered injury to their standing in the community and their reputations."  JKF lost members, which decreased the group's influence in the community, and Datko was "forced to take [JKF's] social media account private, due to a large volume of hateful comments."  Datko also claims that JKF "did not receive any donations" in the months following Dunn's article.  The plaintiffs believe the publications lost them financial contributions.

## B.    Procedural Posture

¶ 11    Datko and JKF filed suit, alleging four claims of defamation.[3] The defendants filed a combined special motion to dismiss under Colorado's anti-SLAPP law, section 13-20-1101(3)(a), C.R.S. 2024, or, in the alternative, to dismiss under C.R.C.P. 12(b)(5).  The defendants' motion argued that the plaintiffs' defamation claims failed because they could not demonstrate a reasonable likelihood that they would be able to produce clear and convincing evidence of material falsity or actual malice at trial.  As an alternative basis for dismissal, the defendants argued that because all the claims

---

[3] Defamation is an umbrella term that encompasses libel.

sounded, if at all, in libel per quod,[4] the plaintiffs' failure to plead special damages with particularity was fatal to their suit.

¶ 12    The district court granted in part and denied in part the motion to dismiss under C.R.C.P. 12(b)(5) but took no action on the special motion to dismiss under the anti-SLAPP law.

¶ 13    In May 2024, the plaintiffs filed their first amended complaint (FAC), asserting the following three claims for relief:

1.    Libel per se, alleging that the defendants published statements that Datko asked JKF members to have their children secretly videotape other schoolchildren dressed as furries.

2.    Libel per quod, alleging that the defendants published or caused to be published statements, "the gist of which was that one or more members of [JKF] urged others to post secret recordings on [sic] children on TikTok, and that one or more [JKF] members posted recordings of Colorado

---

[4] The terms "libel per quod," "libel by implication," and "libel by innuendo" are synonymous and used interchangeably by the parties and Colorado courts. *See, e.g., Pietrafeso v. D.P.I., Inc.*, 757 P.2d 1113, 1115 (Colo. App. 1988).

children acting like furries, accompanied by mocking and harassing comments and the phrase 'killfurrys.'"

3. Libel per quod, alleging that the article implied the defendants sought comment from Datko and JKF through "numerous emails, phone call[s], and tweets," but Datko and JKF "consistently refused to comment on Dunn's reporting or refute the false statements."

¶ 14 The defendants filed an amended special motion to dismiss the FAC under Colorado's anti-SLAPP statute, arguing that the plaintiffs (1) could not establish a reasonable likelihood of prevailing on their defamation claims and (2) were precluded from asserting a claim for libel by implication because they were limited purpose public figures. Following a hearing, the district court concluded that the plaintiffs established a reasonable likelihood that they could prevail on all claims at trial and denied the amended special motion.[5] The defendants appeal.

---

[5] The district court's order did not address the defendants' argument that, as limited purpose public figures, the plaintiffs could not assert a claim for libel by implication.

## II. Analysis

¶ 15 The defendants claim the district court erred by denying their amended special motion to dismiss because the plaintiffs failed to show a reasonable likelihood that they would be able to establish that (1) the statements challenged in the FAC were materially false; (2) the statements challenged in the FAC were made with actual malice; (3) they could demonstrate a claim for libel by implication; (4) they could demonstrate the allegations implied by the article when considered as a whole; and (5) they could demonstrate allegedly per quod statements had caused any financial harm as a direct result of the article.

¶ 16 We agree with the defendants' second contention, which concerns the plaintiffs' libel per se claim. We also agree with defendants' fourth contention, which concerns the plaintiffs' two claims of libel per quod. Because our conclusion is dispositive of the remaining contentions, we need not address those contentions.

### A. Special Motion to Dismiss Standards

¶ 17 Colorado's anti-SLAPP statute exists "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to

11

the maximum extent permitted by law and, at the same time, to protect the rights of persons to file meritorious lawsuits for demonstrable injury." § 13-20-1101(1)(b). The statute strikes a balance by establishing a procedure that allows the district court to "make an early assessment about the merits of claims brought in response to a defendant's . . . speech activity." *Rosenblum v. Budd*, 2023 COA 72, ¶ 23 (quoting *Salazar v. Pub. Tr. Inst.*, 2022 COA 109M, ¶ 12).

¶ 18    A court resolves a special motion to dismiss through a two-step process. *Anderson v. Senthilnathan*, 2023 COA 88, ¶ 10. First, the defendant must show that the plaintiff's claim arises from the defendant's exercise of free speech or right to petition in connection with a public issue. *Rosenblum*, ¶ 24. If the claim falls within the statute's scope, the second step is triggered, and the burden shifts to the plaintiff to establish that there is a reasonable likelihood they will prevail on the claim. § 13-20-1101(3)(a).

¶ 19    During the second step, the district court "must not weigh the evidence or resolve factual conflicts; instead, it must assess whether the plaintiff's factual assertions, if true, establish a reasonable likelihood of proving each claim under the applicable

burden of proof." *Rosenblum*, ¶ 24.[6] If the district court, after considering the pleadings and supporting documents, concludes that there is a reasonable likelihood that the plaintiff will prevail on the claim, it must deny the motion to dismiss. § 13-20-1101(3)(a), (b); *see also Creekside Endodontics, LLC v. Sullivan*, 2022 COA 145, ¶ 23.

¶ 20    We review a district court's ruling on a special motion to dismiss de novo. *Creekside*, ¶ 24. Like the district court, we do not assess the truth of the allegations made in the complaint. *Rosenblum*, ¶ 26. Rather, we merely consider whether the allegations in the pleadings and supporting and opposing affidavits, if true, support a "legally sufficient claim and [make] a prima facie factual showing sufficient to sustain a favorable judgment." *Creekside*, ¶ 26 (quoting *L.S.S. v. S.A.P.*, 2022 COA 123, ¶ 23).

---

[6] We recognize that divisions of this court are split on how to apply the second step and whether a court must accept the nonmoving party's pleadings and averments as true, as it does when ruling on a motion for summary judgment, or whether a court may weigh conflicting facts, as it does when resolving a request for a preliminary injunction. *See Coomer v. Salem Media of Colo., Inc.*, 2025 COA 2, ¶¶ 117-139 (Tow, J., specially concurring); *Jogan Health, LLC v. Scripps Media, Inc.*, 2025 COA 4, ¶¶ 56-76 (Berger, J., specially concurring). Here, under either approach, the result is the same.

¶ 21     No party contests that the plaintiffs' claims arise from the defendants' exercise of free speech in connection with a public issue, so the anti-SLAPP statute applies. We therefore turn to the second step and assess whether the plaintiffs met their burden of establishing a reasonable likelihood of success on their libel per se and libel per quod claims.

## B.     Defamation

¶ 22     Defamation is a communication that holds an individual up to contempt or ridicule, thereby causing them to incur injury or damage. *Keohane v. Stewart*, 882 P.2d 1293, 1297 (Colo. 1994). To prevail on a defamation claim, the plaintiff must establish (1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication. *Lawson v. Stow*, 2014 COA 26, ¶ 15.

¶ 23     "A publication of libel can be either defamatory per se or defamatory per quod, depending upon the certainty of the defamatory meaning of the publication." *Gordon v. Boyles*, 99 P.3d

14

75, 79 (Colo. App. 2004). If the defamatory meaning is apparent from the face of the publication, the publication is defamatory per se. *See id.* If the communication is defamatory per se, the plaintiff need not plead special damages.[7] *Id.* If, on the other hand, "the defamatory meaning may be understood only in reference to extrinsic facts known by the recipient, then the publication is defamatory per quod," and the plaintiff must plead special damages. *Id.*

¶ 24 When, as in the present case, a statement concerns a public figure or a matter of public concern, certain elements of a defamation claim are subject to a higher evidentiary standard. *Anderson,* ¶ 13. As applicable here, the plaintiff must prove by clear and convincing evidence that the statement was materially false and that the speaker published the statement with actual malice. *See Coomer v. Salem Media of Colo., Inc.,* 2025 COA 2, ¶ 23.

¶ 25 Falsity is shown by proving that the substance or the gist of the statement is inaccurate. *Jogan Health, LLC v. Scripps Media,*

---

[7] "Special damages" refer to specific financial losses that a plaintiff suffered because of a defendant's statement. *Lind v. O'Reilly,* 636 P.2d 1319, 1321 (Colo. App. 1981).

*Inc.*, 2025 COA 4, ¶ 23. Minor inaccuracies do not amount to falsity as long as the substance or gist of the statement was true. *Id.* This inquiry focuses "on how an average reader would read the statement." *Fry v. Lee*, 2013 COA 100, ¶ 23. To qualify as a material falsehood, the challenged statement must be false and "'likely to cause reasonable people to think "significantly less favorably" about the plaintiff' than they would if they knew the whole truth." *Jogan*, ¶ 23 (quoting *Fry*, ¶ 50).

¶ 26 To show the defendant acted with actual malice, a plaintiff must prove by clear and convincing evidence that the defendant published the defamatory statement with knowledge of its falsity or with reckless disregard for the truth. *Fry*, ¶ 21. Evidence that a speaker knew their statement was false is rare, so proving this element often rests on showing that the speaker published their statement with reckless disregard. *Creekside*, ¶ 37. While ill will is not an element of actual malice, it can be used as circumstantial evidence of the speaker's subjective attitude toward the subject. *L.S.S.*, ¶ 40.

## C. Discussion

¶ 27 The district court's order denying the special motion to dismiss did not separate the plaintiffs' libel per se claim from their two libel per quod claims. We do so now because special damages must be pleaded with specificity to prove libel per quod and the challenged statements for libel per se are different from the statements attributed to the libel per quod claims.

### 1. Plaintiffs' First Claim for Relief – Libel Per Se

¶ 28 The defendants argue that the plaintiffs failed to meet their burden of demonstrating a reasonable likelihood that they could produce clear and convincing evidence that the statements challenged in the FAC were made with actual malice and were materially false.

¶ 29 We agree that the plaintiffs failed to demonstrate a reasonable likelihood that they could provide clear and convincing evidence of actual malice at trial. Because we conclude that the plaintiffs failed to meet their burden with respect to actual malice, we need not consider whether they met their burden for material falsity.

### a. Actual Malice

¶ 30    The defendants raise three arguments in support of their contention that the plaintiffs failed to meet their burden regarding actual malice. First, the defendants assert that the challenged statements were rational interpretations of Datko's September 2022 Facebook post, which negates actual malice as a matter of law. Second, the defendants claim that the plaintiffs could not prove that the defendants held serious doubts about the truth of the allegations. Third, the defendants assert that the district court incorrectly focused on and applied elements of common law malice instead of actual malice. We agree with all three assertions and analyze them in turn.

#### i.    A Rational Interpretation Negates Actual Malice

¶ 31    If an allegedly defamatory statement purports to be a summary of claims contained in another document, courts consider whether the source document is sufficiently ambiguous to admit more than one rational interpretation. *See Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971). In *Pape*, the United States Supreme Court determined that a publisher's statement "amounted to the adoption of one of a number of possible rational interpretations of a

document that bristled with ambiguities" and that the "deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of 'malice.'" *Id.*; *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 513 (1984) (holding that the publisher's choice of language, "though reflecting a misconception, d[id] not place the speech beyond the outer limits of the First Amendment's broad protective umbrella" and that as a matter of law "the record does not contain clear and convincing evidence that [the defendants] prepared the . . . article with knowledge that it contained a false statement, or with reckless disregard of the truth").

¶ 32 The challenged statements were a rational interpretation of Datko's September 2022 Facebook post. Dunn's article contained a screenshot of the post. Readers of the Facebook post and the article could and *did* interpret the post to mean that Datko was asking for pictures and recordings of students dressed as or behaving like furries. Shortly after making the post — before Dunn's article was published — Datko herself acknowledged on JKF's Facebook page that, after making her post, she received pictures and videos of children dressed as furries but was not

19

comfortable posting them. Several JKF members posted comments on JKF's Facebook page urging Datko to "blur the faces" or "block out the children's faces." Similarly, Grimes's opinion column also interpreted Datko's Facebook post as "encourag[ing] people to take pictures of children who behave or dress differently."

¶ 33 Datko's September 2022 Facebook post did not "bristle with ambiguities," because it was less than fifty words, but it was ambiguous, as evidenced by two diverging — but rational — interpretations. Under Datko's interpretation, she merely asked the children of JKF members to post anonymous audio testimony of their own personal experiences with furries acting disruptively in school and did not invite them to record other children dressed as furries. On the other hand, the defendants, Grimes, and several JKF members interpreted the same message differently — as a request to post pictures and videos of children dressed as furries. Because Datko's Facebook post was subject to interpretation, we conclude, as a matter of law, that the defendants' choice to interpret the post in a way that diverged from Datko's intended interpretation did not create an issue of actual malice for a jury to consider.

### ii. Subjective Awareness of Probable Falsity

¶ 34 As we have previously mentioned, "[a] communication is made with actual malice if it is published with 'actual knowledge that it was false' or 'with reckless disregard for whether it was true.'" *Creekside*, ¶ 37 (quoting *L.S.S.*, ¶ 40). In concluding that the plaintiffs met their burden of proof for actual malice, the district court incorrectly focused on what Datko intended to convey in her Facebook post rather than focusing on the defendants' subjective belief as to the truth of the challenged statements. *See Fry*, ¶ 21 (actual malice requires proof that publisher actually "entertained serious doubts as to the truth of the statement or acted with a high degree of awareness of its probable falsity").

¶ 35 Dunn's article contained a screenshot of Datko's actual Facebook post and the editor's note expressing Datko's disagreement with the defendants' interpretation of her Facebook posting and setting forth Datko's interpretation. Including this information counters any inkling of actual malice because it allows readers to come to their own conclusions about the post and challenged statements. *See, e.g., NBC Subsidiary (KCNC-TV), Inc. v. Living Will Ctr.*, 879 P.2d 6, 12 (Colo. 1994) (noting that broadcast

at issue "provided sufficient information for viewers to answer for themselves" questions about whether a living will kit was "worth it" when the same forms were available at local hospitals and libraries for little to no cost).

### iii. Common Law Malice and Actual Malice

¶ 36 Although ill will "may serve as circumstantial evidence of actual malice 'to the extent that it reflects on the subjective attitude of the publisher,'" *Creekside*, ¶ 39 (quoting *L.S.S.*, ¶ 40), the district court incorrectly used the defendants' hostility toward plaintiffs — which aligns more with common law malice — to find actual malice. Actual malice is knowledge that a statement was false or a reckless disregard for whether it was false or not. *Garrison v. Louisiana*, 379 U.S. 64, 67 (1964). In contrast, common law malice includes "spite, hostility or deliberate intention to harm." *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 10 (1970). In concluding that the plaintiffs satisfied the actual malice element, the district court relied on tweets Dunn made indicating that JKF was an "anti-trans group," that they were "bad actors," and that they were an "awful Facebook group."

22

¶ 37    While those characterizations may have evidenced Dunn's hostility toward the plaintiffs and perhaps established common law malice, such statements, even if used as circumstantial evidence reflecting Dunn's subjective attitude, do not establish actual malice because they have no bearing on whether the challenged statements were false or published with a reckless disregard for their truth. *Cf. L.S.S.*, ¶ 50 (concluding the actual malice standard was established when parents were engaged in a custody dispute and mother had personal motive to falsely allege that father sexually assaulted their child, as "investigations . . . could lead to the termination of parental rights and an indeterminate sentence of several years to life in prison").

¶ 38    The district court erred by not granting the defendants' amended special motion to dismiss the plaintiffs' libel per se claim. The plaintiffs failed to demonstrate a reasonable likelihood that they could produce clear and convincing evidence at trial that the defendants' challenged statements were made with actual malice.

### b. Material Falsity

¶ 39    Because the plaintiffs failed to meet their burden regarding actual malice, we need not consider whether they met their burden with respect to establishing material falsity.

### 2. Plaintiffs' Libel Per Quod Claims

¶ 40    The defendants contend the district court erred by allowing the plaintiffs' libel per quod claims to proceed for three reasons. First, the defendants argue the plaintiffs' alleged implications cannot be drawn from the article. Second, the defendants contend that the district court's order denying the amended special motion failed to address whether the plaintiffs, as limited purpose public figures, could even assert a claim for libel by implication. Third, the defendants argue the plaintiffs failed to sufficiently plead special damages in both libel per quod claims. We agree with the defendants' first contention — that the plaintiffs' alleged implications cannot be drawn from the article.

¶ 41    Because we agree with the defendants' first assertion and conclude that the district court should have dismissed both libel per quod claims, we need not address the defendants' remaining arguments as independent bases for dismissal.

24

### a. Plaintiffs' Second Claim for Relief – Libel Per Quod

¶ 42 Unlike libel per se, libel per quod "concerns cases of libel in which the defamatory meaning, or innuendo, is not apparent on the face of the publication, but must be made out by proof of extrinsic facts." William L. Prosser, *More Libel Per Quod*, 79 Harv. L. Rev. 1629, 1630 (1966).

¶ 43 As part of their second claim for relief, the plaintiffs assert the following:

> Defendants published or caused to be published statements, the gist of which was that one or more members of Jeffco Kids First urged others to post secret recordings on [sic] children on TikTok, and that one or more JeffCo Kids First members posted recordings of Colorado children acting like furries, accompanied by mocking and harassing comments and the phrase "killfurrys."

The plaintiffs' second claim for relief is premised on the theory that Dunn's reporting made people think JKF "caused people to secretly record students acting as furries and resulted in harassment of students."

¶ 44 The defendants argue that the article, when considered as a whole, cannot be reasonably read to imply that Datko and JKF had caused people to secretly record and harass their classmates. The

defendants further contend that the timeline of events leading up to Dunn's article precludes these implications. We agree.

¶ 45 The screenshot of a purported furry was posted to TikTok around April 2022 — five months before Datko's September 2022 Facebook post and six months before Dunn's article. Because the TikTok post predated Datko's Facebook post, it cannot be inferred that Datko's post encouraged others to post videos or comments on TikTok that mocked or harassed children for wearing costumes. Similarly, before the article was published, a JKF member mentioned TikTok had posts on furries in Colorado schools.

¶ 46 Based on the timeline of events leading up to the article and the evidence submitted by both parties, the plaintiffs failed to establish a prima facie factual showing sufficient to establish a reasonable likelihood of prevailing on their second claim for relief. Accordingly, the district court erred by not granting the special motion to dismiss this claim.

b. Plaintiffs' Third Claim for Relief – Libel Per Quod

¶ 47 As part of their third claim for relief (libel per quod), the plaintiffs assert that "[b]oth Dunn and Colorado News published statements that Dunn and others at Colorado News sought

26

comment from Datko and other members of [JKF] through numerous emails, phone call[s], and tweets" and that the defendants "published statements that Datko and other members of [JKF] consistently refused to comment on Dunn's reporting or refute the false statements about Datko and [JKF]." The implication of these statements in the article was that the plaintiffs "refus[ed] to respond to request for comment . . . because they could not and would not defend their positions."

¶ 48 The defendants assert that the plaintiffs' second libel per quod claim fails for two reasons. First, the article stated that "[n]either Datko nor Ganahl responded to Colorado Community Media's requests for interviews about the Facebook group's activities" and "Datko did not respond to interview requests from Colorado Community Media." The defendants assert that these statements were true, as months before the article's publication, Dunn attempted to contact Datko and other JKF leaders by phone, email, and direct messaging. The defendants also contend that JKF's leadership acknowledged receiving requests for comment but declined to respond. Therefore, the plaintiffs could not establish

27

that the statements or the gist of the statements were materially false.

¶ 49    Second, the defendants claim that Dunn reached out to Datko and JKF leadership in July 2022 before the article's publication, inviting them to "explain to the community what [JKF] is all about" and not to comment or defend their positions on the forthcoming article.

¶ 50    Based on the actual comments made in the article, the undisputed evidence the defendants offered showing that Dunn contacted Datko and others, and the timeline of requests, the plaintiffs failed to demonstrate a reasonable likelihood of proving, by clear and convincing evidence, that the statements were materially false.

¶ 51    Accordingly, the district court erred by not granting the amended special motion to dismiss claim three.

### D.    Conclusion

¶ 52    After a de novo review of all the defendants' claims on appeal, we conclude that the district court erred by denying the defendants' amended special motion to dismiss the plaintiffs' libel per se claim

(claim one) and the plaintiffs' libel per quod claims (claims two and three) pursuant to section 13-20-1101(3)(a).

## E.   Attorney Fees and Costs

¶ 53   The defendants request an award of attorney fees and costs under C.A.R. 39.1 and section 13-20-1101(4)(a), which entitles a defendant who prevails on a special motion to dismiss to recover attorney fees and costs.

¶ 54   We exercise our discretion under C.A.R. 39.1 and remand the case to the district court to determine the reasonable amount of attorney fees and costs, including appellate attorney fees and costs, to be awarded to the defendants as the prevailing parties under section 13-20-1101(4)(a).

## III.   Disposition

¶ 55   We reverse the order of the district court denying the defendants' amended special motion to dismiss the plaintiffs' libel per se and libel per quod claims.  We remand to the district court with instructions to dismiss the plaintiffs' case with prejudice and to determine the amount of reasonable attorney fees and costs consistent with this court's instructions.

JUDGE FREYRE and JUDGE GOMEZ concur.

29